# YOUNG CONAWAY STARGATT & TAYLOR, LLP

JOHN W. SHAW
DIRECT DIAL:  (302) 571-6589
DIRECT FAX:   (302) 576-3334
jshaw@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

March 14, 2011

**BY CM/ECF AND HAND DELIVERY**
The Honorable Mary Pat Thynge
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE  19801

**REDACTED -
PUBLIC VERSION**

      Re:    *Ricoh Co. Ltd. v. Oki Data Corp.*, C.A. Nos. 09-694-SLR-MPT

Dear Magistrate Judge Thynge:

In advance of the teleconference scheduled for March 16, 2011 at 4:00 p.m. EDT (D.I. 124), the Oki Data parties ("Oki") respectfully seek an order precluding Ricoh from:

1.     Adding 58 new printers and MFPs, and their components, to their infringement contentions just three weeks from the close of fact discovery.

2.     Adding 24 new claims that were never before asserted in the litigation.

3.     Asserting infringement of products for which Ricoh has never provided a claim chart or shown any good faith basis for its accusations of infringement.

Ricoh's new infringement contentions are found in its March 10 response to Oki's Interrogatory No. 1 (Exh. A), and are highlighted in yellow. Ricoh first raised these new claims and products with exactly three weeks left in the fact discovery period, which closes March 31, 2011. Ricoh's new contentions do not rely on any information produced by Oki during discovery. The new contentions are sand-bagging, pure and simple. They should be stricken.

Ricoh's September 18, 2009, complaint identified 2 Oki printers/MFPs as infringing unspecified claims of 3 Ricoh patents. (D.I. 1, ¶¶ 18, 21, 26, 27, 34, 37). Ricoh responded to Oki's Interrogatory No. 1, which sought Ricoh's infringement contentions, on September 21, 2010. These responses asserted 6 claims between 3 patents, identified another accused MFP and components, and provided one claim chart per patent. (Exh. B at 3-4 and exhibit A attached thereto). Oki objected to expanding discovery beyond the two printers/MFPs expressly accused of infringement. (Exh. C at 2, 4-5). At that point in time, any dispute about the accused products became ripe.

This motion turns on two related subjects – the nature and timing of Ricoh's initial obligation to provide its infringement accusations, and whether the Scheduling Order or the supplementation rules permit Ricoh to add this number of products and claims at this late stage of the litigation.

On the first point, the Federal Rules require litigants to provide full and complete responses to contention interrogatories, including all information then in a litigant's possession, custody, and control. *See, e.g., Amberwave Sys. Corp. v. Intel Corp.*, C.A. No. 05-301-KAJ, Tr. at 20:19-21 (D. Del. May 3, 2006) (regarding duty to respond to contention interrogatories, "if you have a basis that you can put forward now, you should put it forward now. If you know, you should say.") (Exh. D). Further, a patentee is required to identify accused products and provide claim charts from the outset:

> We say this so many times. If you want to sue people, fine, sue them, but have in
> mind exactly what it is you're accusing them of doing, exactly what you have in

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Page 2

mind. . . . That's the complete case you've got to give them. Not only name those products, you've got to give them all your contentions about those products.

*CIF Licensing, LLC v. Agere Sys., Inc.*, C.A.. No. 07-170-JJF, Tr. at 4:14-17, 8:17-20 (D. Del. Nov. 9, 2007) (Exh. E). Further, a plaintiff cannot demand that the accused infringer produce information about products that have not been fairly identified and accused of infringing. *Honeywell Int'l Inc. v. Audiovox Commc'ns Corp.*, C.A. Nos. 04-1337-KAJ, 04-1338-KAJ, 2005 U.S. Dist. LEXIS 41822, at *4 n.2 (D. Del. Oct. 7, 2005), Transcript at 28:12 -29:3 (D. Del. Sept. 9, 2005) ("But what you are not entitled to do is to say you manufacture 15 different kinds of cell phones. We tore down three. Tell us about your other 12. . . . If you want to go out, you want to buy them, you want to do the tear-downs, you want to get information that prompts you to be able to say 'now I know that this specific model also infringes,' then you can certainly do that. And then you would be in an area where you could be requiring additional discovery from them. But to ask them to come forward in the first instance, which is what it really comes down to, is not right.") (Exh. F); *CIF Licensing,* Tr. at 4:24-5:2 ("You can't say to them, look across your product line and tell us everything that meets our claim language.") (Exh. E). Just three weeks before the close of fact discovery and 18 months after Ricoh filed the complaint, the metes and bounds of Ricoh's infringement case long should have been set, and Ricoh should not be permitted to provide new infringement contentions for the first time now, particularly where those new contentions are not based on any discovery from Oki.

On the second point, nothing in the Scheduling Order or the supplementation rules excuses Ricoh's dilatory conduct. The Order requires responses to contention interrogatories, contains a contention deadline of "at latest" one month after the close of document discovery, provides that the party with the burden of proof respond first, and measures the adequacy of responses against those of the opponent. (D.I. 29 ¶2(c)(2)). Oki's original responses are detailed and complete. (*See, e.g.*, Exh. C at 18 and exhibits D, E, and F attached thereto). The Order also requires supplementation at the times provided by the Federal Rules of Civil Procedure and on March 10, 2011. (D.I. 29 ¶2(e)).

Nothing in the Order changes the normal operation of the Federal Rules, and nothing in the Order condones Ricoh's sand-bagging tactics. The March 10 date in the Order is the date for contentions on all sides to become fixed, not a date for dramatic expansion of the case. Supplementation deals with new information learned in the course of discovery, and not known or reasonably known to the responding party at the time of the original response. *AMEX v. Mopex, Inc.*, 215 F.R.D. 87, 93-96 (S.D.N.Y. 2002) (discussing the purpose of Rule 26(e) and finding that party's untimely identification of new asserted claims was not substantially justified). Ricoh's "supplemental responses" are not supplemental responses at all, but rather are completely new contentions about new products and new patent claims.

Ricoh's new claims should be stricken under Fed. R. Civ. P. 37(b)(2)(A), for failure to provide discovery as required in the Scheduling Order, and under Fed. R. Civ. P. 37(c)(1), if the supplementation rule is deemed to apply. In either case, the rules require preclusion unless Ricoh can show that its actions were "substantially justified" or harmless. Ricoh, as the party facing sanctions for late disclosure of its contentions, has "the obligation 'to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction.'" *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) (applying Rule 37(c)(1)).

There is no conceivable reason for Ricoh to delay 18 months after filing its complaint to accuse 58 new products, raise 24 new claims, and to provide 13 new claim charts. Ricoh's new contentions were **not** the product of the natural evolution of discovery. They cite no Oki discovery

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Page 3

documents, but rather reflect information gathered from purchasing and examining Oki products – a process that could and should have occurred before Ricoh filed the complaint, and certainly no later than a year later, when it first responded to Oki's interrogatories. There is no time to re-open discovery to the extent Ricoh's new contentions demand. Oki has focused all of its work on proving non-infringement of the claims Ricoh asserted against the products Ricoh identified. Oki has not produced documents about any other products, it has not formulated non-infringement positions about those products, and it has not educated its Rule 30(b)(6) witnesses about those products. *Bridgestone Sports Co. Ltd. v. Acushnet Co.*, 2007 U.S. Dist. LEXIS 11370, at *15 (D. Del. Feb. 15, 2007) (barring late-disclosed prior art references because the additional time and expense from even a "moderate" discovery extension were "consequences which could have been avoided.").[1]

Oki, moreover, is not at fault. Oki told Ricoh it was objecting to discovery beyond Ricoh's infringement claims. (Exh. C at 2, 4-5). Five months later Ricoh complained that ***Oki had not identified the products Ricoh should accuse of infringement.*** (Exh. G at 2). Oki again explained its position and twice offered to meet and confer (Exh. H, I); Ricoh ignored these offers. Further, Oki had no obligation to bring a motion to compel to require Ricoh to identify more accused products or to raise more claims. *Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y. 1995) ("A party may not free itself of the burden to fully comply with the rules of discovery by attempting to place a heretofore unrecognized duty of repeated requests for information on its adversary."). The Oki parties thus seek the following relief:

**The '669 Patent**: Ricoh accused 31 new products. There is no possible justification – let alone substantial justification – for Ricoh's delay. Ricoh has not provided any claim charts for any of these new products and no explanation for why the one charted product is 'representative' of the new products. Ricoh cannot even claim that it lacked access to 11 of the newly-accused products; it photographed and tested these 11 products to create its new claim charts for its '533 patent. (Exh. A at highlighted portions of exhibit A attached thereto). Finally, Ricoh asserted 18 new claims from this patent against the only charted product. We do not know, however, whether these claims will apply to all listed products or not. All new products and claims should be stricken.

**The '864 Patent**: Ricoh accused 11 new products. Ricoh did not provide claim charts for any of these newly-accused products, even though it has purchased and tested at least one of them. Ricoh also asserted 2 new claims for this patent. All new products and claims should be stricken.

**The '533 Patent**: Ricoh accused 16 new products of infringement, but included claim charts for only two of those products. Ricoh also asserts 4 new claims for this patent. Further, Ricoh's original response included a list of 17 products without any claim charts, which was not enough to place those products in dispute. *CIF Licensing*, Tr. at 8:17-20 (Exh. E). Even now, Ricoh has not provided claim charts for five of these originally-listed products. All products and claims which were not charted in Ricoh's original contention response should be stricken.

Respectfully submitted,

*Braman for John W. Shaw*

John W. Shaw (#3362)

---

[1] This decision applies the *Pennypack* factors (prejudice, ability to cure, likelihood of disruption to the trial schedule, and bad faith) that were superseded by the substantial justification and harmlessness standard now found in Rule 37. Preclusion is appropriate under both standards.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Page 4

Attachments

cc:     Clerk of the Court (by hand delivery)
        Counsel of Record (by CM/ECF and email)

# EXHIBITS A-C
## REDACTED IN THEIR ENTIRETY

**<u>EXHIBIT D</u>**

SHEET 1

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                    - - -

4    AMBERWAVE SYSTEMS CORPORATION,  :  CIVIL ACTION
                                    :
5              Plaintiff,           :
                                    :
6    v.                            :
                                    :
7    INTEL CORPORATION,             :
                                    :
8              Defendant.           :  NO. 05-301 (KAJ)

9                    - - -

10                   Wilmington, Delaware
                Wednesday, May 3, 2006 at 3:00 p.m.
11                   TELEPHONE CONFERENCE

12                   - - -

13   BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.

14                   - - -
     APPEARANCES:
15

16             MORRIS NICHOLS ARSHT & TUNNELL
               BY:  JACK B. BLUMENFELD, ESQ.
17
                    and
18
               IRELL & MANELLA, LLP
19             BY:  JASON G. SHEASBY, ESQ.
                    (Los Angeles, California)
20

21                   Counsel for AmberWave Systems
                     Corporation
22

23

24
                          Brian P. Gaffigan
25                        Registered Merit Reporter

Wednesday, May 3, 2006

SHEET 2

**2**

1  APPEARANCES:  (Continued)

2

3      YOUNG CONAWAY STARGATT & TAYLOR
4      BY:  MONTE SQUIRE, ESQ.

       and

5
6      SIMPSON THACHER & BARTLETT, LLP
       BY:  GEORGE M. NEWCOMBE, ESQ., and
7           PATRICK E. KING, ESQ.
            (Palo Alto, California)

8      and

9      SIMPSON THACHER & BARTLETT, LLP
       BY:  KERRY L. CONRAD, ESQ.
10          (Palo Alto, California)

11           Counsel for Intel Corporation

12

13

14

15

16              - oOo -

17       P R O C E E D I N G S

18       (REPORTER'S NOTE:  The following telephone

19  conference was held in chambers, beginning at 3:00 p.m.)

20       THE COURT:  Hi, this is Judge Jordan.  Who do I

21  have on the line?

22       MR. BLUMENFELD:  Good afternoon, Your Honor.

23  It's Jack Blumenfeld and Jason Sheasby from Irell & Manella

24  for AmberWave; and it's Monte Squire, Patrick King, George

25  Newcombe and Kerry Konrad for Intel.

**3**

1       THE COURT:  All right.  I have read your

2  submissions and why don't we deal with the protective

3  order issue first because I think that's actually more

4  straightforward than you guys are making it.  And I don't

5  really need any further discussion from you on this so I'll

6  just tell how it's coming out; all right?

7       I agree that the information here is a

8  sufficiently sensitive nature that AmberWave, you will

9  inform Intel of information that falls within the categories

10  you've all agreed that limited set of documents that can be

11  shared out to prosecution counsel.  You will tell them when

12  you do that.  You don't have to copy them on the letter

13  that you sent to your prosecution counsel.  You don't have

14  to tell them about other stuff that is obviously unrelated

15  to this case but if you are going to be sending over

16  information about this litigation that's within the narrow

17  confines that you have agreed will be the information that

18  could be passed, you will let them know, hey, we advised

19  them about these pieces of information that we've provided.

20       And I do that solely for this reason:  I agree

21  that if you stay within the bounds you say you are going to

22  stay within, there shouldn't be anything privileged there

23  at all that gets communicated because it's, by definition,

24  public.  And I'm sure everybody is going to be operating

25  in good faith on this.  To the very limited extent that

**4**

1  there could be a waiver here by you're telling them, hey, we

2  communicated this, it ought to be very, very limited and

3  it's an appropriate one in the context of this narrow point.

4       So that's how it's coming down.  If you want to

5  go outside the confines that I would typically put on an

6  order like this and share information with prosecution

7  counsel, I'm letting you do it under that, with that caveat

8  and under the terms you have already agreed to.

9       Does everybody understand my ruling?

10       MR. NEWCOMBE:  Your Honor I have one question.

11  It's George Newcombe.

12       THE COURT:  Yes.

13       MR. NEWCOMBE:  You said something about other

14  stuff unrelated to this case and I'm unclear what that

15  means and I'll tell you my concern in a second.  This case

16  involves some discrete patents that are being litigated

17  before Your Honor.  However, AmberWave has a very large

18  pending portfolio, and I guess I want to be clear that there

19  shouldn't be any other stuff related to AmberWave at all and

20  Intel that is being communicated between litigation counsel

21  and prosecution counsel other than the discrete specific

22  documents that we've agreed upon.

23       THE COURT:  Well, I'll tell you I say that

24  because I have no idea what this firm might be working on

25  with this prosecution counsel other than this case.  That's

**5**

1  all I'm saying.  I mean if they've got other things going

2  on, they've got other things going on.

3       Are you trying to tell me, Mr. Newcombe, that

4  the only thing these people deal with is prosecuting patents

5  that affect Intel?

6       MR. NEWCOMBE:  No.  What I'm saying, Your Honor,

7  is if this case is broad enough to encompass their dealings

8  with prosecution counsel acting on behalf of AmberWave

9  and communications that relate to AmberWave and Intel,

10  then I think we've covered the waterfront.  If they're

11  separately -- I don't know what firm they're using but

12  let's say their firm has a totally different client.

13  They're dealing with the same prosecution counsel on a

14  totally different set of patents.  I'm not trying to cover

15  that.

16       THE COURT:  That's what I'm saying, so I think

17  we're on the same page.

18       MR. SHEASBY:  This is Jason Sheasby for

19  AmberWave, Your Honor.  Just so I can clarify two points.

20       Obviously we're only referring to our

21  discussions with prosecution counsel vis-a-vis their

22  prosecution of applications within the scope of the

23  prosecution bar.  If we were to have communications with

24  someone at the law firm on an issue unrelated to

25  prosecution, unrelated to the subject matter, that's what

United States District Court - Honorable Kent A. Jordan

SHEET 3

**6**

1  I understand Your Honor to be carving out.
2       THE COURT:  Exactly.
3       MR. SHEASBY:  The second clarification I asked
4  for, there two categories of information we can provide.
5  There is just published documents, published prior art as
6  people usually call it and then there is stuff from the
7  litigation.  And I understand Intel's concern to be there
8  might be some mix-up as to what from the litigation is
9  confidential and not confidential and I just want to clarify
10  the Court's order we have to tell them what materials from
11  the litigation we're providing, but would that extend to
12  just published articles that aren't part of the publication
13  that may come across our desk, for instance, that we may
14  turn over?
15       THE COURT:  I am trying to make sure that the
16  information that gets passed to prosecution counsel is not
17  in any way effected by or infected by what is going on
18  within the bounds of confidentiality within this case.  So I
19  read Intel's letter to be saying to me, look, in the best of
20  faith, people make mistakes and here is an example of where
21  somebody turned over confidential information by mistake.
22       So if the only thing that you're passing on is
23  public information, that wouldn't be a problem.  But if it's
24  passing on information that is produced in the course of
25  this litigation, then that is the place that they have asked

**7**

1  for a check.
2       Am right, Mr. Newcombe?
3       MR. NEWCOMBE:  Your Honor, I guess what we were
4  trying to capture is any communication between them because
5  this is so sensitive we're making an exception to the bubble
6  and I thought we had agreed it would be limited solely to
7  publications, papers filed in the case and deposition
8  transcripts, period.  What concerns me a bit here is this
9  opening it up to other things which I'm not sure how far
10  that goes.
11       THE COURT:  Well, that's --
12       MR. NEWCOMBE:  The description as only
13  prosecution which leaves more wiggle room, it really should
14  be no communication with the patent firm and litigation
15  counsel except for these very discrete things that relate in
16  any way to AmberWave and Intel.  If they have some other
17  client, we're not trying to catch that.
18       THE COURT:  Well, you are taking us back to the
19  point where I said I'm not worried about and I think frankly
20  you may be worried about it and I just don't get it but I
21  think I do get it.  What all I have tried to say is I'm not
22  telling them they can't talk to that law firm about other
23  matters they may have.  And I don't know why that would
24  bother you.  Certainly, there would be other matters that
25  they have that have nothing to do with Intel.  And my only

**8**

1  reason for saying what I said is earlier is to make it clear
2  I'm not trying to cut off their communications about cases
3  or projects or other things they're doing that just don't
4  involve you.  And I'm not sure what you are objecting to
5  about that.
6       MR. NEWCOMBE:  I'm not objecting to that, Your
7  Honor.  I think we're saying the same thing.  Maybe I'm
8  being a bit cautious here.
9       MR. SHEASBY:  And I think Mr. Newcombe is
10  muddying the waters a bit because obviously we have to have
11  communications with prosecution counsel because there are
12  individuals for prosecuting patents for AmberWave right now
13  who are potentially going to be witnesses in this litigation
14  and obviously we're going to have to interview those
15  witnesses and discuss their previous prosecution as it
16  relates to this case.  What I understand the order to be
17  saying, what I understand the Court to be saying when we're
18  talking about live prosecutions of applications, the only
19  communication we should be having with prosecution counsel
20  is submitting these three categories of information:
21  published articles, documents that are served only
22  litigation, deposition transcripts.
23       THE COURT:  Mr. Newcombe, you weren't intending
24  to cut off communications with these firms about stuff that
25  is already in the past, were you?

**9**

1       MR. NEWCOMBE:  To the extent to which there is
2  a witness who is being deposed, that's fine as long as
3  it's related solely to the past, I agree.
4       THE COURT:  All right.  Then I think we're
5  actually all on the same page.
6       MR. SHEASBY:  And then I apologize, Your Honor.
7  So what we have to record, what we have to give to them and
8  tell them what we sent to them is the list of the materials
9  that are filed and served in the litigation, the deposition
10  transcript.
11       THE COURT:  Yes.  If I have said something that
12  was less than clear, I apologize.  Let me try to clarify.
13  What I understand Intel to be concerned about; and I agree
14  with their concern, I agree with it; is that you could turn
15  something over thinking it's okay to turn this over, it
16  wasn't marked confidential or that's what you thought and
17  they never knew it went over and in fact it was confidential
18  information.  And they want to know when you send something
19  over that was passed back and forth in this case so that
20  that doesn't happen.  That's what I'm trying to reach out to
21  and get.
22       If it's the case that all you're doing is
23  sending over, hey, here is an article in the swimsuit issue
24  of the semiconductor chip magazine and it's public and
25  everybody knows it, then that is public.  But if you're

SHEET 4

**10**

1  sending over something that you got from Intel, they ought
2  to get to know what you are sending over so that they can
3  put the brakes on it.
4        And what I'm suggesting to you folks is that you
5  work out a mechanism so that you give Intel the heads up
6  before it goes over, and this is not unlike circumstances
7  where you give people a heads up of five days or so before
8  you disclose to an expert. Just give them enough of a heads
9  up, and then the onus is on Intel to get back to you. And
10  if they don't, it goes over. And if they do and they have
11  an objection, you try to work it out. And if you can't work
12  it out, you come to me.
13        MR. SHEASBY: We understand, Your Honor.
14        THE COURT: Mr. Newcombe, are you on board with
15  that?
16        MR. NEWCOMBE: I am, Your Honor. Thank you.
17        THE COURT: All right. So go ahead and work
18  your language up to address that, if you would, please.
19        Now, shifting over to the issues that were
20  raised in Mr. Blumenfeld's letter of May 1st about
21  supplemental discovery and then the May 2nd letter from
22  Mr. Squire about that same topic. Why don't you go ahead.
23  You've had a chance to see the response from Mr. Squire at
24  this point.
25        Mr. Blumenfeld or Mr. Sheasby, who is going to

**11**

1  be speaking on this point?
2        MR. SHEASBY: Your Honor, this is Jason Sheasby.
3  I'll be speaking.
4        THE COURT: Okay. Why don't you go ahead, if
5  you would, and tell me what, if anything, you would want to
6  say in response to the letter to from Mr. Squire.
7        MR. SHEASBY: I think there are two issues in
8  response to the Intel letter. The first is sort of a common
9  tactic in discovery disputes which is to say "you're bad
10  as well." So what Intel said in their letter is we can't
11  respond, we can't give you any detail because the response
12  isn't complete. Of course, in the September 15th letter
13  what Intel said they want claim charts that make structure
14  to claim limitations we provided December 19th for the '292
15  patent and provided to them on February 2nd for the '632 and
16  '371 patent. Now, if there is some specific information
17  that is lacking in those claims charts, they should tell us.
18  They say there was one specific piece of information lacking
19  we provided to them. Where we can't be is in a situation
20  where Intel says we can't give you any more information
21  because your responses are terrible. We're not going to
22  tell you what you need to do to fix them, they're just
23  terrible now, and at some point after you supplement and
24  your supplement gets good enough, we'll provide more
25  information. I don't think that is fair. I don't think

**12**

1  that is appropriate.
2        The reality is that Intel has filed their
3  contention responses for noninfringement/invalidity of the
4  '371 and '632 patent which were identical in form to those
5  that were the subject of the December 15th hearing on the
6  '292 responses. They list a bunch of claim limitations and
7  they say we don't infringe one or more of those limitations.
8        Now, this was an interrogatory response.
9        THE COURT: Okay. Let me interrupt you because
10  now I'm kind of getting a repeat of your letter and I have
11  read your letter. Respond, if you would, directly to the
12  assertion they make that you've only said in the broadest
13  terms there is a strained silicon process and you guys
14  infringe it and that that is what they're left trying to
15  respond to. And so since you make a very broad general
16  statement about infringement, they can only given you a
17  broad general argument for noninfringement. That is I take
18  it is the gist of their letter. What is the response you
19  have to that?
20        MR. SHEASBY: Your Honor, we attached our claim
21  charts and I think what the claim charts make clear, we
22  didn't give a broad general statement. There is a method
23  they use to create strain in their transistors.
24        THE COURT: Let's get specific on this call.
25  Take me to the language that you are talking about in the

**13**

1  attachments you gave me, and I'll make them respond to that
2  and tell me why they can't do better.
3        MR. SHEASBY: Okay. So if you turn to Exhibit
4  E, Your Honor.
5        THE COURT: Yes.
6        MR. SHEASBY: Exhibit E is our claim chart in
7  the '292 patent. And if you turn to page eight of that, in
8  response, you will see what we've done is we've laid out on
9  the left side elements of the claim and on the right side
10  we've laid out structure that we think exists. Actually, I
11  think a really good example is if you turn to page nine and
12  you look at Claim 14.
13        THE COURT: All right. I'm there.
14        MR. SHEASBY: It says: The semiconductor
15  structure of Claim 10 wherein the impurity gradient
16  describes at least the concentration of germanium.
17        What we said is that the impurity gradient whose
18  value is substantially equal to zero in the distal zone of
19  the channel region as set forth in connection with Claim 10,
20  describes the concentration of germanium.
21        Now, I don't understand why Intel can't respond
22  and give us the facts, if there is germanium in the region
23  of their PMOS device. They obviously have those facts in
24  their devices.
25        THE COURT: Yes, let's ask them. I'm glad we're

Wednesday, May 3, 2006

SHEET 5

**14**

1 being specific.
2      So, Mr. Newcombe, they're saying we've told you
3 why we think you infringe and you won't answer us with any
4 facts saying why you don't.  And they're pointing at this
5 specifically.  Give me a specific response.
6      MR. NEWCOMBE:  Okay.  Your Honor, I mean, first
7 of all, if you look at, they have not described the process
8 at all.  So the first point of Your Honor mentioned about
9 this, there is a bunch of articles.  They haven't given us
10 any specificity whatsoever.
11      In terms of, excuse me, looking at Claim 14.
12      THE COURT:  Page nine of Exhibit E.
13      MR. NEWCOMBE:  Right.  We have responded in
14 Claim 1 to the fact we do not infringe Claim 1, which is an
15 independent claim for a variety of reasons which we laid out
16 for them.
17      With respect to Claim 14, the impurity gradient,
18 they haven't defined where their distal zone is, they
19 haven't defined the channel layer, they haven't defined any
20 of the structures here.  And so we're still at a loss as
21 to where they're talking about.  The distal zone is a part
22 of a layer.  The layer has never been delineated the layer.
23 There is no interface ever identified in this.  And you
24 know, I think one of the issues here which we suggested in
25 our letter -- and I'd just like to throw it out because I

**15**

1 really do believe this is the best way to proceed -- is
2 that once we enter this protective order, we are going to
3 produce to them our cookbooks and other extremely sensitive
4 documents that tell you step-by-step how we build these
5 devices, what is in them, what we do.  And what I suggest is
6 a better way to go than try to slide this thing out back and
7 forth is once they get this, which we haven't been able to
8 give to them until we resolve this protective order, then I
9 have a period of time to look at it, have them get back to
10 us with more specificity and we will get back with more
11 specificity and the case will go forward.  I think we're in
12 an artificial identification position since we've been held
13 up from producing these.
14      THE COURT:  Mr. Sheasby.
15      MR. SHEASBY:  Yes, I did like to respond to
16 that, Your Honor.  I think the suggestion that they don't
17 know what process they're using to create the strain in
18 their PMOS devices I think is clearly disingenuous.  All the
19 articles we pointed to describe the same possess.
20      In addition, I think we should get into some
21 detail here because I think it's productive.  If we look
22 at Exhibit D, which is Intel's supplement after the
23 December 15th hearing on the '292 patent.
24      THE COURT:  I'm looking at it.
25      MR. SHEASBY:  And if you turn to page 67.

**16**

1      THE COURT:  I'm there.
2      MR. SHEASBY:  And in the paragraph that is
3 underlined, it says:  Moreover, there are many impurities
4 in Intel substrate (including the channel region) from
5 implantation and diffusion.
6      We asked them in a letter on January 30th what
7 are those impurities?  What is their concentration in the
8 channel region?  They refused to respond.  Why can't they
9 respond to that?
10      THE COURT:  Let's ask them.
11      Is there any reason why you won't respond to
12 that?
13      MR. NEWCOMBE:  These are all things that they're
14 going to see in the documents we were going to produce.
15      THE COURT:  Okay.  Well, you know what?  Let's
16 short-circuit this.  I actually think Mr. Newcombe's
17 suggestion is a good one, but I think the argument that we
18 can't answer that or shouldn't answer that is bogus.  I mean
19 if you had a basis for saying we can't answer that until we
20 have a protective order in place because it's going to be
21 giving away too much, it's what you should have said.  But
22 to say we can't answer it because it's too general, if
23 they've asked a specific question about an assertion you've
24 made, that's not too general and you should have given
25 an answer and the answer should have been specific and

**17**

1 responsive to the question asked.  And if you couldn't give
2 it because there was confidential information, that's what
3 should have been said.
4      But instead, I have people fighting over what is
5 specific enough and what is general enough when what I'm
6 getting is that the real undercurrent here and problem is we
7 don't want to give anything until we're satisfied that there
8 is a protective order that is going to guard us.  If that is
9 really what is going on, let's just say that is going on and
10 deal with it instead of saying it's too general, it's too
11 general because there is at least one example where I have
12 to agree with AmberWave it was not too general.  There was a
13 precise question formulated and a specific answer should
14 have and could have been given.
15      But having said all that, I'm going to set the
16 gamesmanship aside for a moment and say I actually think
17 Intel has got a good suggestion here.  If we're now at the
18 point that we can get this protective order in place, I'll
19 expect to get something from you by -- can I have a form of
20 order from you by Friday?  What do you think?
21      MR. NEWCOMBE:  I would hope so, Your Honor.
22      THE COURT:  Well, is there more than hope here?
23      MR. NEWCOMBE:  Yes, I think so.
24      THE COURT:  Mr. Sheasby, does that sound all
25 right to you?

United States District Court - Honorable Kent A. Jordan

SHEET 6

**18**

1    MR. SHEASBY: Your Honor, if I may. I actually
2 have a couple problems with that suggestion.
3    THE COURT: Go ahead. Put them on the record.
4    MR. SHEASBY: The first problem is that one of
5 the reasons why we wanted contention interrogatories is
6 because it guides discovery. It allows for targeted
7 discovery.
8    THE COURT: I'm not telling you may not get
9 these, I'm just saying I agree with Intel that once you get
10 this and you give it a fair look, you know, you may say I
11 can ask better discovery now. I can indeed conduct this in
12 a more precise fashion. Not only that, if you feel like
13 they're waffling on you, you've got something to fall back
14 on to say, no, your internal documents say this. I want to
15 you own up to it. So I'm not saying they never have to
16 answer your contention interrogatories. I'm accepting
17 Intel's response that once you have this, you guys will
18 have a basis for discussion and that's what I expect will
19 happen.
20    MR. SHEASBY: Your Honor, that doesn't really
21 address a lot of the issues we're struggling with. So,
22 for example, they refused to provide any infringement or
23 noninfringement contentions for the independent claims that
24 have been asserted against them. Why does discovery need to
25 commence before they provide that information? They cited

**19**

1 180 references that they suggest invalidate the '371 patent
2 and the '632 patent. Why does discovery need to commence
3 for us to know the facts that supported that assertion? You
4 know, they say the patent's invalid because of anticipation
5 and obviousness and written description and enablement and
6 all they do is list the legal definitions for those
7 standards. They should be able to provide the facts that
8 supported those interrogatory response when they gave them
9 and I think it actually gets more serious.
10    In the '632 patent, we ask them to provide to
11 us their basis for saying there was unclean hands. And you
12 know what their response was? Their response was to say,
13 well, there are some articles. We're not going to tell
14 you've which ones that we believe your inventors knew and
15 that's all they've given.
16    That was the exact same thing they did in the
17 '292 patent interrogatory responses, subject of the December
18 15th hearing. The Court ordered them to respond in more
19 detail. Why have they refused to respond to that
20 information? Well, it turns out we actually learned
21 something in their letter of yesterday. Now they're saying
22 we don't have any facts. When we said there was an article
23 that you guys failed to disclose to the PTO, we don't have
24 anything in mind. To me, that is serious and that brings up
25 a whole other host of questions.

**20**

1    THE COURT: All right. Well, and you know what?
2 You may have very well pursue those host of questions. I'm
3 not telling you you can't. I am only saying this: Let's
4 get the order in place and take a couple of weeks for you
5 folks to discuss and see if you can't narrow these disputes.
6    I will say as a general matter, however, now
7 that you mention it specifically the notion that I don't
8 have to tell you why I say I'm not infringing the dependent
9 claim because I've told you why we're not infringing the
10 independent claim, I'm going to read that to mean you don't
11 have any basis except your noninfringement basis as to the
12 independent claim and if that is the position you want to
13 take, don't expect to come to trial and have another basis
14 for why you infringe a dependent claim because I won't let
15 you put it on.
16    Now, here is the way this is going to work.
17 You are going to give your infringement/noninfringement
18 positions and you are going to have adequate time to
19 supplement, within the bounds of reason. So if you have
20 a basis that you can put forward now, you should put it
21 forward now. If you know, you should say. If you don't,
22 you should say this is as much as I can now. We reserve
23 our right to supplement in a timely manner. And I expect
24 people to supplement in a timely manner. And if everybody
25 is playing fair, we will probably avoid a circumstance where

**21**

1 somebody comes in on the eve of the close of discovery or
2 after discovery is over and say, oh, by the way, here's
3 another reason why we don't infringe. Because then that
4 would be a real problem.
5    MR. NEWCOMBE: I agree, Your Honor.
6    THE COURT: So don't look at this, Mr. Sheasby,
7 as they get a walk. Think of it as I'm putting you both
8 in time out because now there going to be some information
9 present and presumably with a protective order in place
10 the real issue here, maybe I'm wrong about it but I'll
11 reiterate, it sounds like the real problem that has been
12 going on here without being stated is Intel is hyper-
13 sensitive about talking about its confidential stuff and so
14 it said, oh, you're vague, you're vague, you're vague when
15 they're really saying I'm not going to give you anything in
16 the protective order. That's not the way it should have
17 gone forward. That's the way it sounds to me. It has that
18 feel to me.
19    So now I'm taking that out of the mix. We're
20 getting a protective order in place, and I'll give you a
21 couple weeks to try to deal with it. And then if we have
22 to, we'll reschedule this. I can tell you right off the bat
23 what I said in the December 15th conference goes so don't
24 step forward with the same nonsense with respect to later
25 patents if I have already told you. "Nonsense" is a little

SHEET 7

**22**

1  extreme but I have already told you that that is not going
2  to fly. You've got to do better than that. You do. You
3  just have to do better than that. I can't believe that you
4  don't have enough information on the Intel side to give them
5  more responsive answers than something I've already told you
6  is inadequate with respect to another patent.
7       So take this as a gentle prodding to you on the
8  Intel side to get serious about giving responsive answers
9  to the contention interrogatories so I don't have to keep
10  having to deal with contention interrogatory answer issues.
11      On the AmberWave side, take time to look at this
12  and see if you can't start giving them targeted discovery
13  so I don't hear you saying, well, you asked contention
14  interrogatories way back when and they never responded, and
15  then have Intel say to me we gave them this information and
16  it's right here in black-and-white that's responsive to it,
17  and then have you say, yeah, but they didn't answer the
18  interrogatory. Do you understand what I'm trying to get to,
19  you folks, that I want to avoid?
20      MR. SHEASBY: I do, Your Honor. And I think
21  one of the things that would help in that regard is the
22  interrogatory request asks them to identify documents
23  they use to support their contentions. For example, the
24  noninfringement contentions. They refuse to provide that.
25  I'm going to go out on a limb and guess they're going to

**23**

1  produce am immense amount of documents in this case. The
2  idea we're going to have to go through hunting for needles
3  in a haystack to find the critical core documents I think
4  is daunting and somewhat unfair to AmberWave.
5       THE COURT: And you won't be asked to do that.
6  You are entitled to say, what do you rely on? And they
7  can't say those 18 boxes. So that's not going to happen.
8  All right?
9       MR. SHEASBY: I understand, Your Honor.
10      THE COURT: I'll expect this form of protective
11  order on my desk by close of business Friday. I'll get it
12  signed promptly. And then I'd like you guys to take two,
13  maybe three weeks, see what you can work out. If we're back
14  here again, we're back here again. I will not be upset with
15  AmberWave, you folks, if you feel like you need to come back
16  because you are still not getting what you think you are
17  entitled to. I will not be upset with Intel either if they
18  have some sound basis for refusing to produce something but
19  I'm not going to hear anymore the notion that, well, we just
20  can't answer this, if AmberWave can point me to a specific
21  question and it's clear to me there could be a specific
22  answer. Okay? So I'm expecting better in the way of
23  responses.
24      MR. NEWCOMBE: Your Honor, I just want to say --
25  this is George Newcombe. I don't want to belabor this at

**24**

1  all and we didn't take that tact in their response, but it
2  does go both ways, and I'll give you one simple example.
3      AmberWave came up with a response to tell us
4  where substantially the semiconductor region was in the '371
5  patent in our accused device. And they simply pointed,
6  identified this Si Ge strain, which is the entire region.
7  We then sent them a picture and said here is a picture.
8  Circle, tell us where it is. And they said we can't do
9  that.
10      THE COURT: Well, that's great, you know. And
11  in the sense that you are able to point to something
12  specific, too, you guys, both sides, have something to talk
13  about then; right?
14      MR. SHEASBY: I agree, Your Honor. If they
15  ask for specific information and it's reasonable, we are
16  prepared to provide it.
17      THE COURT: Then if you are both prepared to be
18  reasonable, I shouldn't have to hear from you again about
19  contention interrogatories because I'm persuaded that
20  reasonable counsel on both sides can work this out. But if
21  we do have to get together, I'll be happy to spend time with
22  you and see if we can't hammer something out. I'm hopeful
23  that won't be necessary and I do think that if Intel gives
24  you this information and they'll provide you some pointers
25  to where they think the specific points are that are

**25**

1  responsive, we're probably going to be okay. But let's see
2  how that works; okay? And I'll look for the protective
3  order by Friday.
4      MR. NEWCOMBE: Thank you, Your Honor.
5      THE COURT: Is there anything else we ought to
6  address while we're all another line together, Mr. Sheasby?
7      MR. SHEASBY: I don't believe so.
8      THE COURT: Mr. Neuberger?
9      MR. NEWCOMBE: I don't believe so either, Your
10  Honor.
11      THE COURT: All right. Thanks. Good-bye.
12      (Telephone conference ends at 3:37 p.m.)

**EXHIBIT E**



WILCOX & FETZER LTD.

In The Matter Of:

# CIF Licensing, LLC v. Agere Systems, Inc.

---

## Transcript of Proceedings

C.. # 07-170 JJF

November 9, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CIF LICENSING, LLC,              )
                                 )
        Plaintiff,               )
                                 )
v.                               ) C.A. No. 07-170 JJF
                                 )
AGERE SYSTEMS, INC.,             )
                                 )
        Defendant.               )


                        Courtroom 4B
                        844 King Street
                        Wilmington, Delaware


                        Friday, November 9, 2007
                        10:10 a.m.


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge



                  TRANSCRIPT OF PROCEEDINGS




                     WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
                     www.wilfet.com.

Page 2

1      THE COURT:  CIF Licensing versus Agere.
2  Mr. Shaw, good morning.
3          MR. SHAW:  Good morning, Your Honor.  For
4  Agere, John Shaw and Ian Saffer from Townsend and
5  Townsend and Crew.
6          MR. ROVNER:  Philip Rovner for CIF
7  Licensing.  Mike Connolly from McDermott Will & Emery in
8  D.C.
9          THE COURT:  Apparently you can't get
10  together on discovery here.  Actually, I guess I see
11  Mr. Rovner was, interestingly, previously involved in a
12  similar dispute, I think.  I think the movant here has
13  put into the record -- my thoughts have always been about
14  how these disputes work unless there's something that the
15  judge doesn't understand, and that's why I thought I
16  would get you on, because maybe I'm missing something.
17  But I kind of think your side of the case might have
18  heard this kind of language before from the judge.  You
19  had an obligation to tell people, look, this is your
20  product, you think it infringes, here's why, you know
21  we're accusing you of infringing, you have got something
22  that we believe infringes.  And that ought to be the
23  baseline.
24          That was Judge Jordan talking previously.

Page 3

1  When I look at these, I kind of get the sense that a
2  defendant -- as the other judges of the court I think
3  view this, I view it, and that is that the defendant
4  doesn't have any kind of a linking or contemporaneous
5  obligation to give up discovery that would in any way
6  thwart their effort to get discovery from the party suing
7  them.
8          So what's different about this case that
9  would interrupt those kind of principles?
10          MR. ROVNER:  Mr. Connolly is going to
11  address those.
12          MR. CONNOLLY:  Good morning, Your Honor.
13  Mike Connolly.
14          In this case, in our definition of products
15  that was given to Agere, we listed 10 specific products
16  that we wanted discovery on.  In our response to their
17  interrogatories, we identified 11 as accused products.
18  They know the specific products.  And in the two
19  meet-and-confers we had before this hearing we offered to
20  limit the period of discovery to initially start going
21  six years back.  We said, look, just give us a bare list
22  of your products going back six years.  We will tick off
23  the ones that we want and then we can talk about it if
24  there's further need to talk.

Page 4

1          I feel like we have been accommodating in
2  saying we will give you specific products, not some
3  general definition, not something that you think is
4  overbroad.  We will go to spec products and tell you
5  which ones are at issue.  We're not trying to tie that or
6  we don't need to tie that to contentions that we already
7  have in order to win the case.  If it's appropriate,
8  we're happy to file representative infringement
9  contentions on the products we know about for whatever
10  that will help.  I don't think it limits discovery in any
11  way.
12          THE COURT:  This happens in every case.
13  That's why I was interested in reading this transcript
14  that was attached as an exhibit by the movant.  We say
15  this so many times.  If you want to sue people, fine, sue
16  them, but have in mind exactly what it is you're accusing
17  them of doing, exactly what you have in mind.  Doesn't
18  matter.
19          Then it goes on to say, and that means if
20  you say you produced an accused device, you need to have
21  some basis for having an accused device and ask them,
22  okay, tell us about this accused device, which is what
23  you say you're doing.
24          Then there's this little bit of a tag.  You

Page 5

1  can't say to them, look across your product line and tell
2  us everything that meets our claim language.  That's the
3  second part of what you're saying you're not getting.
4  Sort of the same thing, unless I'm missing something.
5          MR. CONNOLLY:  I guess what I'm saying is
6  we're precisely not doing that second thing.  The
7  complaint initially was your product --
8          THE COURT:  You're satisfied with the
9  discovery responses you have gotten?
10          MR. CONNOLLY:  Oh, no.
11          THE COURT:  In essence, they're responding
12  to what you claim?
13          MR. CONNOLLY:  No.  I guess what I'm saying
14  is we have given them a specific list of products that
15  we're saying accused that we know about.  We're saying
16  tell us what products you have had in the last six years,
17  which is information that's hard to define off whatever
18  sources we have.  We are not saying to them here's our
19  claim, you guys give us everything that infringes this
20  claim.
21          THE COURT:  What they're saying is the
22  family of this litigation are the products you know about
23  right now.  You're saying are there any other products.
24  Is that what you're asking?

2 (Pages 2 to 5)

Page 6

1    MR. CONNOLLY: That's essentially it, in
2  the sense that we know about these products, they know that
3  they infringe, we believe that they do, and I believe
4  we're entitled to discovery on those. We have identified
5  them for them. They are withholding that discovery on
6  the basis that they don't think they should have to give
7  discovery on other products. That seems to me two
8  different issues. They have lumped it together.
9      But on the other products we're saying,
10  look, if you think our definition is too generic, just
11  give us your products going back six years. Hardly an
12  onerous task. We will give you any other specific
13  products by product name that we believe infringe.
14  Discovery begins on those and we're happy to give initial
15  infringement contentions, final infringement contentions,
16  all in accordance with the --
17    THE COURT: You haven't done that yet.
18    MR. CONNOLLY: No.
19    THE COURT: That's the point of their
20  motion. I understand what you're saying about other
21  products and what you told me in the papers was, well,
22  you know, we got to get this other information and all
23  and their motion, essentially the argument is premature.
24  They're saying, you sued us, tell us everything that

Page 7

1  we're asking for about what you sued us about, and
2  actually that's very timely, and this other stuff you
3  want shouldn't be contingent in any way on what we're
4  entitled to as a defendant at this point.
5      What you're saying is we don't want to give
6  you our -- I think the cleanest interpretation of what
7  you're saying is and the way I would probably try to say
8  it is, all right, we will give you everything about the
9  products we noticed, but this isn't our whole case
10  possibly. So you're on notice we're going to supplement.
11  And then they can't come in here at the near end of the
12  fact discovery and say they just dropped these other
13  15 products on us and we shouldn't have to comply,
14  because you have told them, there is more we think and
15  we're willing to give you complete discovery now in your
16  request and you understand we may be getting more later.
17    MR. CONNOLLY: That's right, Your Honor.
18  And I think this all grew out of this notion that if we
19  don't give them -- if we don't reduce the number of
20  claims, give them claim construction, give them detailed
21  infringement contentions, they're not going to give us
22  anything even on the products we have accused. Obviously
23  they know --
24    THE COURT: They're going to have to give

Page 8

1  you on the products you have accused.
2    MR. CONNOLLY: Right. So out of that kind
3  of block came this. I agree with you, our infringement
4  contentions on the products we know about do not need to
5  be linked to their discovery. We can give them
6  contentions on what we have got. Obviously it helps both
7  parties the more information we have, the more detailed
8  those can be, the further along we get in this case. So
9  we're happy to do what we need to do to move discovery
10  along in this case.
11    THE COURT: You agree with Judge Jordan
12  that, when you sued them, you had a complete case in
13  mind.
14    MR. CONNOLLY: Absolutely, as to products
15  we knew about. Like I said, we have named those products
16  over and over again.
17    THE COURT: That's the complete case you've
18  got to give them. Not only name those products, you've
19  got to give them all your contentions about those
20  products.
21    MR. CONNOLLY: We're happy to do that,
22  Your Honor.
23    THE COURT: Good.
24    MR. CONNOLLY: We would ask production move

Page 9

1  along.
2    THE COURT: That's the point I'm trying to
3  make. It's not a quid pro quo. That's what
4  Judge Jordan was trying to say in that transcript.
5      Now, if you think that they're not either
6  through a meet-and-confer or through a demand providing
7  you with what you're entitled to at this juncture of the
8  litigation, your remedy is to come here next month with
9  your motion to compel.
10    MR. CONNOLLY: I understand that,
11  Your Honor. Unfortunately, it looks like we may end up
12  seeing you again. I just was worried that reading their
13  motion and their proposal would be that they would get to
14  stay their discovery until we gave infringement
15  contentions. As long as that's not in the case, then we
16  don't need to go into that.
17    THE COURT: Sometimes I thought that's not
18  a bad solution, but these cases are too complex to do
19  that. I'm staying on defendant's discovery until you lay
20  your case out as you knew it when you filed it, but you
21  would all think I didn't understand anything about
22  litigation, so I can't do that. I wouldn't do that.
23  You're entitled to have responsive discovery, too, and
24  hopefully you won't be put to a motion.

3  (Pages 6 to 9)

Page 10

1      MR. CONNOLLY: I hope so, too.
2      THE COURT: Thank you.
3      MR. CONNOLLY: Could I clear something up
4  on the Honeywell case you referred to that's in their
5  papers?
6      THE COURT: Sure.
7      MR. CONNOLLY: The issue that was addressed
8  in Exhibit A of the transcript that's in defendant's
9  reply papers in Honeywell, the plaintiff was seeking
10 discovery on the other products, and Judge Jordan, as you
11 noted, said no.
12      In this case we're not seeking discovery.
13 We just want identity. Honeywell was merely asking for
14 the identity of the products as opposed to discovery.
15      THE COURT: I understand that. What
16 Judge Jordan was dealing with was an interesting
17 discussion about foundation and a prior ruling and he had
18 to go back and reread it all.
19      What I was trying to draw out of that is
20 that the obligations for discovery aren't reciprocal.
21 Obligations of discovery are based on what you ask for if
22 you can't work it out in a meet-and-confer and we make a
23 decision on the request. And too many lawyers, and a
24 little bit in this motion, think that it's reciprocal.

Page 11

1  That's the only principle I was drawing out of
2  Judge Jordan. There is no reciprocal obligation that's
3  established.
4      In fact, I'm always amazed in a discovery
5  dispute why anybody cites a case, a transcript, or
6  anything. First of all, I don't believe in pressing it
7  at all. But if you believed in it a little bit, it
8  certainly wouldn't apply to discovery. The only thing
9  that would be applicable to discovery are the rules and
10 facts of this case. What we say in any other case is all
11 contextual.
12      I understand what you're saying. I'm on
13 board.
14      MR. CONNOLLY: I often wondered what would
15 happen in the other case had Honeywell proposed a
16 compromise that we're doing here.
17      THE COURT: You never got to that. I was
18 only drawing the pearls of Judge Jordan's wisdom about
19 discovery not being reciprocal, what the obligations are
20 under the rules when you sue or if you get discovery
21 served on you as a defendant.
22      MR. CONNOLLY: Understood. Thank you, Your
23 Honor.
24      THE COURT: Thank you. I can't imagine

Page 12

1  what you have to say. I think you won.
2      MR. SAFFER: Mr. Shaw told me to be
3  exceedingly brief. I will be.
4      When can we have the plaintiff's
5  contentions that you described, the accused products
6  versus the asserted claims with claim constructions?
7      THE COURT: Now that you understand what I
8  have said, I'm going to let you go back and talk to each
9  other, because I want you to get this discovery in a more
10 fluid exchange. But I'm not thinking it's going to be
11 more than 20 days that you're going to be able to have
12 this exchange and set out in some cooperative way what
13 you each have to do to get the case moving forward in a
14 complete way.
15      I think you both agree there's going to be
16 representative claims here ultimately. That will be part
17 of your discussion, too. I don't think you have to
18 narrow it at this point, but I think you ought to be
19 thinking about that as you spend your client's money in
20 discovery.
21      MR. SAFFER: I don't want to cite precedent
22 because of Your Honor's comments just a moment ago.
23 Understanding it's not for present purposes, but it's
24 more summary judgment or tying down the line, how many

Page 13

1  claims and how many products does Your Honor think are
2  appropriate?
3      THE COURT: I didn't bring my quarter for
4  the flip. So I don't know today. I'd have to know a lot
5  more about the case. It's really much too early for me
6  to be able to say anything that would be serious, but I
7  will be able to down the road.
8      MR. SAFFER: Thank you, Your Honor.
9      THE COURT: If you can't agree. If you can
10 agree, I always like you to try the case you want to try.
11 If you can't, then I'm more than happy to weigh in, but I
12 think it will happen more down the road.
13      MR. SAFFER: Thank you, Your Honor.
14      THE COURT: Okay. Here's what I'm going to
15 do, because I don't want to get you off on a bad foot:
16 I'm going to deny the motion to compel because that's a
17 serious thing, a motion to compel. Somebody didn't meet
18 their obligation. So that will be an order I'll enter.
19 And then if you all don't work it out, I'll expect to see
20 you back here either in December or January on
21 cross-motions or a one-sided motion if you can't work it
22 out. Thank you.
23      (The proceeding was concluded at
24 10:38 a.m.)

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

Page 14

C E R T I F I C A T E

STATE OF DELAWARE)
)
NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered Merit
Reporter and Notary Public, do hereby certify that the
foregoing record, pages 1 to 14 inclusive, is a true and
accurate transcript of my stenographic notes taken on
Friday, November 9, 2007, in the above-captioned matter.

      IN WITNESS WHEREOF, I have hereunto set my
hand and seal this 12th day of November, 2007, at
Wilmington.

        Kimberly A. Hurley

        Certification No. 126-RPR
        (Expires January 31, 2008)

Wilcox & Fetzer, Ltd.  Registered Professional Reporters
302-655-0477

**EXHIBIT F**

SHEET 1

1

```
 1              THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   HONEYWELL INTERNATIONAL, INC.      :    CIVIL ACTIONS
     et al.                            :
 5                                      :
                    Plaintiffs,         :
 6                                      :
              v.                        :
 7                                      :
     AUDIOVOX COMMUNICATIONS CORP.,     :
 8   et al.                             :
                                        :    NO. 04-1337 (KAJ)
 9              Defendants.            .:
     ---------------------------------
10   HONEYWELL INTERNATIONAL, INC.      :
     et al.                            :
11                                      :
                    Plaintiffs,         :
12                                      :
              v.                        :
13                                      :
     APPLE COMPUTER, INC.,  et al.,     :
14                                      :    NO. 04-1338 (KAJ)
                    Defendants.
15                         - - -

16                Wilmington, Delaware
             Friday, September 9, 2005 at 10:40 a.m.
17                TELEPHONE CONFERENCE

18                         - - -

19   BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.

20                         - - -
     APPEARANCES:
21

22        ASHBY & GEDDES
          BY:  STEVEN J. BALICK, ESQ.
23
                    and
24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

SHEET 2                                                          Friday, September 9, 2005

2

```
 1   APPEARANCES: (Continued)
 2
 3       MORRIS NICHOLS ARSHT & TUNNELL
         BY:  THOMAS C. GRIMM, ESQ.,
 4
              and
 5
         ROBINS KAPLAN MILLER & CIRESI, L.L.P
 6       BY:  MARTIN R. LUECK, ESQ.,
              MATTHEW L. WOODS, ESQ., and
 7            STACIE E. OBERTS, ESQ.
              (Minneapolis, Minnesota)
 8
              and
 9
         HONEYWELL INTERNATIONAL
10       BY:  J. DAVID BRAMAN, ESQ.
11            Counsel on behalf of Honeywell
              International, Inc., and Honeywell
12            Intellectual Properties, Inc.
13       SMITH KATZENSTEIN & FURLOW
         BY:  ROBERT J. KATZENSTEIN, ESQ.
14
              and
15
         HOGAN & HARTSON, LLP
16       BY:  ROBERT J. BENSON, ESQ.
              (Los Angeles, California)
17
              Counsel for Seiko Epson Corp.,
18            Kyocera Wireless Corp.
19       YOUNG CONAWAY STARGATT & TAYLOR
         BY:  JOHN W. SHAW, ESQ.
20
              Counsel for Olympus Corporation,
21            Olympus America, Inc., Sony Corporation,
              And Sony Corporation of America
22
23            . and
24
25
```

4

```
 1   APPEARANCES:  (Continued)
 2
 3       FISH & RICHARDSON, P.C.
         BY:  THOMAS L. HALKONSKI, ESQ.
 4
              Counsel for Nokia, Inc., Casio, Inc., Casio
 5            Computer and Apple Computer Inc.
 6            and
 7       FISH & RICHARDSON, P.C.
         BY:  JOHN T. JOHNSON, ESQ., and
 8            LEWIS E. HUDNELL, III, ESQ.
              (New York, New York)
 9
              Counsel for Casio, Inc., Casio Computer
10
11       FISH & RICHARDSON, P.C.
         BY:  KELLY C. HUNSAKER, ESQ.
12            (Redwood City, California)
13            Counsel for Apple Computer Inc.
14
15       FISH & RICHARDSON, P.C.
         BY:  LAUREN A. DEGNAN, ESQ.
16            (Washington, District of Columbia)
17            Counsel for Nokia, Inc.
18
         RICHARDS LAYTON & FINGER
19       BY:  CHAD M. SHANDLER, ESQ.
20            and
21       HARRIS BEACH, LLP
         BY:  NEAL L. SLIFKIN, ESQ.
22            (Pittsford, New York)
23            Counsel for Eastman Kodak
24
25
```

3

```
 1   APPEARANCES: (Continued)
 2
 3       KENYON & KENYON
         BY:  ROBERT L. HAILS, ESQ.
 4            (Washington, District of Columbia)
 5            and
 6       KENYON & KENYON
         BY:  JOHN FLOCK, ESQ.
 7            (New York, New York)
 8            Counsel for Sony Corporation, and Sony
              Corporation of America
 9
              and
10
         KENYON & KENYON
11       BY:  RICHARD M. ROSATI, ESQ.
              (New York, New York)
12
              Counsel for Olympus Corporation, and
13            Olympus America, Inc.
14       RICHARDS LAYTON & FINGER
         BY:  WILLIAM J. WADE, ESQ.
15
              and
16
         WEIL GOTSHAL & MANGES
17       BY:  STEPHEN J. RIZZI, ESQ.
              (New York, New York)
18
              Counsel for Matsushita Electrical
19            Industrial Co. And Matsushita
              Electical Corporation of America
20
21
22
23
24
25
```

5

```
 1   APPEARANCES:  (Continued)
 2
 3       POTTER ANDERSON & CORROON, LLP
         BY:  RICHARD L. HORWITZ, ESQ.
 4
              Counsel for Concord Cameras, Dell, Inc.
 5            Fujitsu Limited, Fujitsu America, Inc.,
              Fujitsu Computer Products of America, Inc.,
 6            Toshiba Corporation, Toshiba America, Inc.,
              Wintek Electro-Optics Corporation, Sanyo
 7            Electric Co. Ltd. and Sanyo North America,
              Philips Electronics North America Corp.
 8            and Samsung SDI
 9            and
10       FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
         BY:  BARRY W. GRAHAM, ESQ.
11            (Washington, District of Columbia)
12            Counsel for Nikon Corporation, Nikon Inc.
13            and
14       KATTEN MUCHIN ROSENMAN
         BY:  MICHAEL A. DORFMAN  ESQ.
15            (Chicago, Illinois)
16            Counsel for Sanyo Electric Co. Ltd.
              and Sanyo North America
17
              and
18
         OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT, P.C.
19       BY:  CARL E. SCHLIER, ESQ.
              (Alexandria, Virginia)
20
              Counsel for Toshiba America
21
              and
22
         VINSON & ELKINS
23       BY:  RODERICK B. WILLIAMS, ESQ.
              (Austin, Texas)
24
              Counsel for Dell, Inc.
25
```

United States District Court for the District of Delaware
Before the Honorable Kent A. Jordan

SHEET 3

**6**

```
1   APPEARANCES: (Continued)
2
3        MILBANK TWEED HADLEY & McCLOY, LLP
         BY:  CHRISTOPHER E. CHALSEN, ESQ.
4             (New York, New York)
5                Counsel for Fujitsu Limited, Fujitsu
6                America, Inc., Fujitsu Computer Products
                 of America, Inc.
7                and
8        FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
         BY:  YORK FAULKNER, ESQ.
9             (Reston, Virginia)
10               Counsel for Wintek Electro-Optics
                 Corporation
11
12               and
         HOWREY SIMON ARNOLD & WHITE, LLP
13       BY:  ALAN M. GRIMALDI, and
              NELSON M. KEE, ESQ.
14            (Washington, District of Columbia)
15               Counsel for Philips Electronics
                 North America Corp.
16
17               and
         PAUL HASTINGS JANOFSKY & WALKER, LLP
18       BY:  STEPHEN S. KORNICZKY, ESQ.
              (San Diego, California)
19
20               Counsel for Samsung SDI
21               and
22       CONCORD CAMERA CORP.
         BY:  SCOTT L. LAMPERT, ESQ.
              (Hollywood, Florida)
23
24               Counsel for Concord Camera
25
```

**7**

```
1   APPEARANCES:  (Continued)
2
3        SACHNOFF & WEAVER
         BY:  BRIAN D. ROCHE, ESQ.
4             (Chicago, Illinois)
5                Counsel for Argus a/k/a Hartford
                 Computer Group, Inc.
6
7        POTTER ANDERSON & CORROON, LLP
         BY:  PHILIP A. ROVNER, ESQ.
8
9                and
10       STROOCK & STROOCK & LAVAN LLP
         BY:  LAWRENCE ROSENTHAL, ESQ.
              (New York, New York)
11
12               Counsel for Fuji Photo Film Co., Ltd.
                 And Fuji Photo Film U.S.A. Inc.
13
14       DUANE MORRIS
         BY:  D. JOSEPH ENGLISH, ESQ.
15            (Washington, District of Columbia)
16               Counsel for Audiovox Communications Corp.
17       YOUNG CONAWAY STARGATT & TAYLOR
         BY:  ADAM WYATT POFF, ESQ.
18
19               and
20       GREENBLUM and BERNSTEIN, PLC
         BY:  MICHAEL J. FINK, ESQ.
              (Reston, Virginia)
21
22               Counsel for Pentax Corporation,
                 Pentax U.S.A, Inc.
23
24
25
```

**8**

```
1   APPEARANCES: (Continued)
2
3        BOUCHARD MARGULES & FRIEDLANDER
         BY:  KAREN L. PASCALE, ESQ.
4
5                and
         OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
6        BY:  ANDREW M. OLLIS, ESQ.
              (Alexandria, Virginia)
7
8                Counsel for Optrex America, Inc.
9        McCARTER & ENGLISH
         BY:  THOMAS D. WALSH, ESQ.
10
11               Counsel on behalf of Optrex America
12       CONNOLLY BOVE LODGE & HUTZ
         BY:  JAMES MICHAEL OLSEN, ESQ.
13
14               Counsel on behalf of Sony Ericsson AB
                 and Sony Ericsson, Inc.
15
16
17
18
19
20
21
22                     - oOo -
23                 P R O C E E D I N G S
24       REPORTER'S NOTE:  The following proceedings were
25   held in open court, beginning at 10:40 a.m.)
```

**9**

1    THE COURT: Counsel, this is Judge Jordan. I
2  apologize keeping you waiting. The folks who were in the
3  queue ahead of you exceeded their allotted time but we were
4  able to work some things out and I appreciate your patience.
5    Why don't we go ahead and I'll get a roll call
6  from you folks of who is on the line and who you represent.
7  Okay? Let's start with the plaintiff.
8    MR. GRIMM: Good morning, Your Honor. It's Tom
9  Grimm at Morris Nichols for Honeywell. On the line with me
10  today; first, Your Honor may recall Honeywell filed two
11  separate actions so on the line with me also is John Day of
12  the Ashby & Geddes firm.
13    Our co-counsel on the line with us this morning
14  are Martin Lueck, Matt Woods and Stacie Roberts at the
15  Robins Kaplan Miller & Ciresi firm. And also on the line
16  this morning with us is David Brafman, Intellectual Property
17  counsel for Honeywell. And that's for all plaintiff
18  Honeywell.
19    THE COURT: All right. Let's just start down
20  the list of defendants. Go ahead.
21    MR. HORWITZ: Your Honor, this is Rich Horwitz
22  at Potter Anderson on behalf of a number of defendants. And
23  with me on the line, I'll go through the list.
24    THE COURT: Well, you need to tell me which
25  defendants you are here for. I know this is —

SHEET 4

10

1  MR. HORWITZ: That's fine. I'm on the line for
2  Dell, Fujitsu, Concord Camera, Toshiba, Nikon, Samsung SDI,
3  Sanyo, Wintek and Philips.
4  And with me on the line for Dell, Rick Williams;
5  for Philips, Alan Grimaldi and Nelson Kee; for Fujitsu,
6  Christopher Chalsen; for Sanyo, Michael Dorfman; for
7  Toshiba, Carl Schlier; for Nikon, Barry Graham; for Wintek,
8  York Faulkner. We are on alone for Concord Camera. And for
9  Samsung SDI, Stephen Korniczky.
10  MR. LAMPERT: One correction. This is Scott
11  Lampert for Concord Camera.
12  MR. HORWITZ: I'm sorry, Scott. I didn't
13  realize you were on.
14  THE COURT: All right. Thanks.
15  Is there anybody else on?
16  MR. WADE: Your Honor, it's Bill Wade at
17  Richards Layton & Finger, and I'm on for the Matsushita
18  defendants along with Steve Rizzi and perhaps David Lender
19  from Weil, Gotshal & Manges.
20  MR. BENSON: Your Honor, this is Robert Benson
21  of Hogan & Hartson on for Seiko Epson and Kyocera Wireless.
22  MR. KATZENSTEIN: Your Honor, this is Robert
23  Katzenstein. I'm Mr. Benson's local counsel.
24  MR. HALKOWSKI: Your Honor, this is Tom
25  Halkowski on behalf of Nokia, Apple and Casio. And with me

11

1  on the line on behalf of Nokia is Lauren Degnan; and on
2  behalf of Apple, Kelly Hunsaker; and on behalf of Casio,
3  John Johnson and Lewis Hudnell. Thank you.
4  THE COURT: All right.
5  MR. ROVNER: Your Honor, this is Phil Rovner for
6  the Fuji Photo Film defendant. With me on the line is Larry
7  Rosenthal from Stroock Stroock & Lavan in New York.
8  THE COURT: Okay.
9  MR. ROCHE: Your Honor, Brian Roche in Chicago
10  for Hartford Computer Group.
11  THE COURT: And is somebody on with you, sir, as
12  local counsel?
13  MR. ROCHE: No.
14  THE COURT: Have you arranged for local counsel?
15  MR. ROCHE: Yes, we have local counsel from
16  Cross & Simon.
17  THE COURT: All right. Typically, we look for
18  those folks to be on those calls too unless excused. But
19  thanks for identifying yourself.
20  Who else is on?
21  MR. SHANDLER: Your Honor, Chad Shandler for
22  Richard Layton for Eastman Kodak. With me on the line is
23  Neal Slifkin from Harris Beach.
24  THE COURT: Anybody else?
25  MR. WALSH: Your Honor, Tom Walsh with McCarter

12

1  & English on behalf of Audiovox Electronics Corporation.
2  MR. POFF: Your Honor, Adam Poff from Young
3  Conaway on behalf of the Pentax defendants. And also
4  Michael Fink from Greenblum and Bernstein on behalf of
5  Pentax.
6  MR. SHAW: Your Honor, John Shaw for the Olympus
7  and Sony defendants, and I believe Richard Rosati and Bob
8  Hails is for Olympus.
9  MR. ROSATI: Rich Rosati for Olympus.
10  MR. SHAW: And Bob Hails is for the Sony
11  defendants.
12  THE COURT: Okay.
13  MR. OLSEN: Your Honor, James Olsen from
14  Connolly Bove for the Sony Ericsson defendants.
15  MR. ENGLISH: Your Honor, this is Joe English
16  from Duane Morris on behalf of Audiovox Communications Corp.
17  THE COURT: And do we have anybody else on?
18  MR. FLOCK: Your Honor, this is John Flock from
19  Kenyon & Kenyon, also on for Sony corporation.
20  THE COURT: Thank you.
21  MS. PASCALE: Your Honor, this is Karen Pascale
22  from Bouchard Margules & Friedlander for Optrex America
23  which is the named plaintiffs in the 04-1536 action; and on
24  the line with me is Andrew Ollis from the Oblong Spivack
25  firm.

13

1  THE COURT: Okay. Do I have anybody else?
2  (Pause.)
3  THE COURT: All right. Well, thanks for
4  assembling. I'm glad the telephone company has got enough
5  lines to handle this call.
6  We are together because in spite of what I
7  thought was pretty clear direction a few months ago, we
8  still haven't been able to get plaintiffs and defendants
9  moving forward on this case, and I received a letter on
10  August 22nd from Mr. Grimm saying, "hey, since our
11  correspondence to you in June, we're still at odds."
12  So, I've taken a look at the correspondence but
13  why don't I give you a chance to tell me what you think the
14  points in dispute are that can't be resolved without my
15  intervention so we can get a scheduling order in place,
16  short of me just imposing one.
17  Who is speaking on behalf of the plaintiffs on
18  this?
19  MR. GRIMM: Your Honor, this is Tom Grimm.
20  Marty Lueck of the Robins Kaplan Miller & Ciresi firm will
21  speak.
22  THE COURT: Mr. Lueck.
23  MR. LUECK: Good morning, Your Honor. I think I
24  can give you a snapshot here of where we've made progress,
25  where we haven't and I think give the Court an idea of how

SHEET 5

14

1 we might be able to resolve the logjam so we can transition
2 this case from the customer defendants to the module maker
3 defendants.
4     Basically, what we have asked for in discovery
5 from the customer defendants is a list of all products sold
6 in the United States in the categories that are set forth
7 in the complaint going back from October 6th, 1998 to the
8 present. And we've asked for the identity of a module maker
9 for each of those products and the LCD module model number.
10 And the reason we've asked for that information is so that
11 we can match up the LCD modules that were manufactured
12 overseas to the end products that were actually imported
13 into the United States and sold because those are the ones
14 that are going to be at issue for both liability and
15 ultimately, down the road, damage.
16     THE COURT: All right. I'm sorry to interrupt,
17 Mr. Lueck. Give it to me one more time. What is it that
18 you specifically asked for in discovery?
19     MR. LUECK: What we're asking for is a list of
20 all -- and let me just back up. This is for the customer
21 defendants. A list of all products sold in the United
22 States in the categories set forth in the complaint from
23 October 6th, 1998 to the present. And that's consistent
24 with the patent statute of limitations, six years back from
25 the date of filings of the complaint. The products.

16

1 three of the defendants, Nikon, Concord Camera and Fuji. I
2 believe we're close to resolving it with Nokia and Olympus
3 but were unable to make progress with the others.
4     THE COURT: All right. And what is the basis of
5 your agreement with the ones you have resolved it with?
6     MR. LUECK: In essence, Your Honor, they have
7 agreed to provide us that information: A historical list of
8 products going back to 1998, the identity of the module
9 maker for each product and the LCD module number that is in
10 the product.
11     THE COURT: All right. And is that really the
12 heart of the dispute? Is there some other thing going on
13 that I need to know about or is this really a kind of an
14 Alphonse-and-Gaston thing about who goes through the door
15 first?
16     MR. LUECK: Yes, I think that is correctly
17 summarized, Your Honor. I believe if we can resolve this
18 issue, we can make a lot of progress to resolving everything
19 else.
20     THE COURT: Okay. Who wants to take this up in
21 the first instance for the defendants?
22     MR. HORWITZ: Your Honor, this is Rich Horwitz.
23 I think that you have captured what the main
24 dispute is and, really, it boils down to who should go
25 first. Based on what Your Honor told us when we were in

15

1     THE COURT: All right. Now, before you go
2 further, let me ask you what I took it to be the other
3 side's position and just have you respond to it directly.
4     I think they were saying to saying to me, these
5 guys should be identifying the products they think infringe
6 in the first instance. Am I right that that is a point of
7 contention or am I wrong about that?
8     MR. LUECK: You are correct, Your Honor, as to
9 some of the defendants.
10     THE COURT: What is your response?
11     MR. LUECK: Our response to that is we have
12 identified all of the products that we have purchased and
13 torn down and found specific instances of infringement.
14 We're unable to buy every product that is out there, and in
15 fact for the products that are in the past, we have no idea
16 whether we would have all of those or not have all of them.
17 And we don't believe on a going-forward basis, it should be
18 our burden to buy every single product of every single
19 company, tear it down and then make an individual charge of
20 infringement.
21     We have given them all the information we have
22 to date. And, in addition, we have offered to tear down
23 any products they want to send us and we will give them a
24 response on the results of that tear-down. And that really
25 is the logjam right there. We have resolved that issue with

17

1 front of you, I think we quoted the language from the
2 transcript where we think it's their obligation to come
3 first as the plaintiff charging infringement.
4     There may be some defendants who want to speak
5 specifically because the burdens on defendants are different
6 depending on how many products fall within the eight
7 categories that were mentioned in the complaint for the time
8 period that we're talking about here, to reach back and grab
9 things for plaintiff with no firm charge of infringement.
10 And I think that is the nub of the controversy.
11     There are some other issues that haven't been
12 discussed yet today that plaintiff raised in its submissions
13 and we responded to that we thought were outside the scope
14 of what the Court ordered, but that is kind of a collateral
15 matter to the main issue which is the one that you have been
16 focusing on so far.
17     So if there are individual defendants, I think
18 that they should be able to jump in at this point, if they
19 want to add argument on their specific circumstances.
20     THE COURT: Okay. Who wants to speak? Don't be
21 shy.
22     MR. GRAHAM: Your Honor, this is Barry Graham
23 for the Nikon defendants. And I hope everyone can hear me
24 well. I had to be on a cell phone today.
25     As Mr. Lueck acknowledged, which I appreciate,

SHEET 6

18

1  that Nikon has resolved, has given Honeywell what it asked
2  for. We gave them specific information in July, and the way
3  I read the Court's May 18th order, Nikon and other customer
4  defendants were under basically a conditional stay. And I
5  would like, at least for Nikon, and there may be others, to
6  ask the Court to change the conditional stay into a real
7  stay while the other parties resolve their differences with
8  the plaintiff.
9          THE COURT: All right. Does anybody else want
10  to speak?
11          MR. ROSENTHAL: Your Honor, this is Lawrence
12  Rosenthal for Fuji.
13          In fairness to the other defendants who still
14  have this dispute, as you may recall, Fuji asked the Court
15  to limit the case to the eight categories. Honeywell has
16  now conceded that is what the case is limited to. And if
17  the case is limited to eight categories, this case becomes a
18  single product case for Fuji and the burden became finite
19  and easy to satisfy. I think you will hear from other
20  defendants that that is not the case.
21          THE COURT: Is there anybody else?
22          MR. RIZZI: Your Honor, this is Stephen Rizzi of
23  Weil Gotshal for the Matsushita defendants.
24          Just to give you a sense of an example where
25  we're not similarly situated to some of these defendants

20

1  Mr. Lueck, back to you. I'll give you a chance to rebut.
2          MR. LUECK: Thank you, Your Honor. Basically
3  it's hard for me to understand how the burden could be
4  greater on the defendants to provide this information than
5  on Honeywell to go out and try to uncover every product that
6  each of these defendants have sold in the past.
7          THE COURT: Well, wait. I've got to wrestle
8  with you on that premise because at the start, I moved from
9  the baseline understanding that the way our adversary system
10  works is you learn of something that tells you you've been
11  wronged and then you go and you draft a complaint that
12  identifies that wrong and you come to court and you bring
13  somebody in to answer for that wrong. So when you start by
14  saying, gee, let's look at who has got the greater burden
15  here, why is it the burden of defendants in the first
16  instance to tell you everything they ever made with an LCD
17  module in it when there's apparently a reluctance or
18  unwillingness or inability on your part in the first
19  instance to make a case that a product actually does
20  infringe?
21          I'm probably giving away the way I'm thinking
22  right now, aren't I? I'm having a real problem with the
23  fundamental premise with your argument which is we think
24  there is other stuff out there that infringes and we want to
25  know everything you made in the last six years so we can

19

1  like Nikon and Fuji, Matsushita is a very diverse
2  electronics company and has products that span many of the
3  categories. And if you literately consider going back six
4  years, all LCD-containing products in those categories,
5  there are hundreds, if not perhaps more than a thousand
6  products in this action.
7          Honeywell has identified three products of
8  Matsushita that are accused of infringement. We, months
9  ago, told Honeywell who the LCD suppliers are for those
10  products: two cell phones and one laptop. And just as sort
11  of a fundamental matter of discovery and burden shifting,
12  we don't believe that identification of three products
13  justifies discovery of hundreds, if not perhaps a thousand
14  products that may or may not be accused of infringement.
15  The burden is squarely on Honeywell to identify which
16  products they believe infringe and the case should be framed
17  around those products. And we do not believe that merely
18  identifying three products justifies essentially a fishing
19  expedition into all products going backs six years which
20  could number well into the hundreds, if not more.
21          THE COURT: Okay. I got you.
22          Does anybody else feel like they want to say
23  something?
24          (Pause.)
25          THE COURT: All right. Hearing nothing,

21

1  decide whether we got a case against you or not. That just
2  isn't how it works.
3          MR. LUECK: Well, Your Honor, I believe we have
4  made that showing. And what we have done is we've gone out
5  and bought a large number of products from a wide range of
6  customers or end manufacturing defendants. We've torn them
7  down. We've given the defendants detailed information on
8  what we believe is the infringement. We identified the
9  eight product ranges where we found it.
10          The modules come from module makers overseas.
11  We have no access to those individuals. And I think we've
12  satisfied our Rule 11 burden, we satisfied the pleading
13  burden on it, and then it becomes an issue of whether or
14  not this is reasonably calculated to lead to admissible
15  information, which we believe it is, and then it is an issue
16  of looking at the relative burdens. And in our view on
17  burden, we have a right to recover for damages going six
18  years back from the date of the complaint. These models
19  change rapidly and often. And we simply have no access to
20  records that would show us what those models have been.
21          THE COURT: Well, let me ask this, because
22  maybe we're talking past each other. When you say you have
23  satisfied your initial burden, is the assertion that you are
24  making that we have identified products, we've told them the
25  products that infringe and the only question is whether,

**22**

1  through various generations of different models of this
2  product, somehow there is some difference? Or is there
3  something else going on that I'm not getting.
4         MR. LUECK: No, I think you have captured it.
5  We've identified what the products are that have infringed
6  and we've specified what those types of products are and
7  we've given them specific model numbers as to ones we've
8  been able to purchase and tear down, but that doesn't mean
9  that we know all of the generations of those products that
10 they have introduced in the past.
11        THE COURT: All right. I'm going to ask the
12 gentleman who spoke on behalf of Matsushita, the Weil
13 Gotshal attorney if he will speak up at this point and
14 answer that point, which is: Hey, we're not just on some
15 wholesale fishing expedition. We've identified a product
16 and a product line and we just need to know the different
17 model numbers in that product line so that we're sure that
18 we've had a chance to investigate this product thoroughly,
19 which is what I understand Mr. Lueck to be saying. What is
20 your response to that?
21        MR. BRAFMAN: Your Honor, this is David Brafman
22 from Honeywell.
23        I'd just like to add one further point which is
24 our tear-down rate, on average it's about a 50 percent hit
25 rate under our belief of infringement across all these

**23**

1  products. So it's not a wild fishing expedition as it is
2  made to sound. It is that we found products, a large
3  percentage of them do hit and we just don't have access to
4  the models that change every six months.
5         THE COURT: All right. Mr. — I'm sorry, I've
6  forgotten your name, sir.
7         MR. RIZZI: It's Steve Rizzi from Weil Gotshal.
8         THE COURT: Mr. Rizzi, I apologize for not
9  holding on to that name. Go ahead.
10        MR. RIZZI: That's okay. I think along those
11 lines, Your Honor, there is room to meet in the middle here
12 from our perspective and, in fact, one of the cases that
13 Honeywell cited in its correspondence I believe is
14 instructive -- the IP Innovation case out of the Northern
15 District of Illinois -- I think is somewhat similar in the
16 sense that case involved certain chips that were found
17 in various models of televisions that were accused of
18 infringement, the basis for infringement being this specific
19 chip. And what the plaintiff did originally was identify
20 specific television models that they believe included the
21 chip and were infringing. And there, the Court allowed
22 discovery of other models of televisions that included that
23 same chip. So discovery in the case were structured
24 around other future generations or products but only those
25 products that included the same chip as the specific models

**24**

1  of televisions that were identified by plaintiff.
2         We think structuring it along those lines is
3  reasonable and does provide a framework that does allow
4  for a manageable case as well. And that we believe it is
5  possible to identify, for example, other products that
6  utilize the same LCD modules incorporated in these specific
7  products that are alleged to infringe and that we don't
8  believe that that would present an unreasonable burden,
9  and we don't dispute that plaintiffs would be entitled to
10 that type of information.
11        THE COURT: All right. Mr. Lueck.
12        MR. LUECK: Yes. What we asked for, Your Honor,
13 is the modules that were identified in the infringing
14 products and similar modules. And the problem we have is if
15 you were to go to these module makers, some of the modules
16 infringe, some of the modules don't. The module makers do
17 not know what products they go into for the customers.
18 Literally, the only way for anyone to find that out is to
19 ask them for the historical products. And we've offered to
20 take anything that they have and look at it and tell them
21 whether it infringes.
22        I don't believe the burden is as great as the
23 defendants are saying. We've narrowed it down to specific
24 products we've torn down. We don't know all of the
25 historical model numbers. That's the information we're

**25**

1  asking for.
2         THE COURT: All right.
3         MR. WILLIAMS: Your Honor, this is Rick Williams
4  for Dell.
5         THE COURT: Yes.
6         MR. WILLIAMS: I'd like to weigh in on this. In
7  the complaint, the products they're looking for include
8  cellular phones, digital cameras, PDAs, portable DVD
9  players, laptop computers. In the case of Dell, they
10 identified six models of Dell laptop computers out of a
11 total current 17 models.
12        The first thing, all of Dell's laptops are
13 readily available to purchase over the Internet and they can
14 get them within a week's time and evaluate them.
15        They have not identified any PDAs, which Dell
16 also sells.
17        Dell resells digital cameras and digital video
18 cameras. They have not identified any of those as being
19 accused against Dell.
20        So we're faced with the dilemma, out of all
21 these categories, they say they'd like information on --
22        THE COURT: Well, we're not --
23        MR. WILLIAMS: -- them going down the list and
24 giving them information.
25        THE COURT: Hold on. Because I get the feeling

SHEET 8

26

1  we're still talking past one another here. Maybe positions
2  have shifted as a result of the conversation we're having,
3  but what I hear what Mr. Lueck is saying is not I want
4  information about broad categories of products. I want
5  information about a specific product identified and
6  different generations of that same identified product. That
7  is, has a model changed? And if it has changed, would you
8  please identify what the newer different model is of that
9  identified product? Not category of products but a
10  specified product.
11      Mr. Lueck, have I misunderstood you?
12      MR. LUECK: Well, I think that is narrower than
13  we seek, Your Honor. I mean if it's going to be tied to
14  specific model numbers, we don't know what the past model
15  numbers these devices are marketed under. Basically what
16  we're asking for is which of your products had the modules
17  that had the infringing technology or the similar technology
18  in them so we can tie them back to the module makers and
19  know what modules were imported into the United States.
20      THE COURT: All right. I interrupted.
21      MR. LUECK: That could be a different model
22  number than what we have, we just don't know that, and we
23  have no other way of finding out.
24      THE COURT: The gentleman from Dell, I
25  interrupted you, sir. Go ahead.

28

1  entitled to say, you know, we think all your cellular phones
2  infringe so we want you to tell us everything about all your
3  cellular phones. What I mean is if you've got a basis for
4  believing that a manufacturer's cellular phones are
5  infringing, and I mean you can say we've done this tear-down
6  on these specific products and these things appear to us to
7  infringe, well, then you are absolutely entitled to conduct
8  additional discovery with respect to those products, that
9  is, were earlier generations than the one you tore down.
10  Also, have they come out with subsequent generations of that
11  same model which could also be infringing?
12      But what you are not entitled to do is to say
13  you manufacture 15 different kinds of cell phones. We tore
14  down three. Tell us about your other 12. Because I agree
15  with the defendants that now what you are doing is you are
16  telling manufacturers, you know what? You got one or two
17  things that are bad. We want to you do an analysis of
18  everything you make and tell us whether you are guilty on
19  those fronts, too; and that is not what the law requires,
20  and it's not what I'm going to require them to do.
21      If you want to go out, you want to buy them, you
22  want to do the tear-downs, you want to get information that
23  prompts you to be able to say "now I know that this specific
24  model also infringes," then you can certainly do that. And
25  then you would be in an area where you could be requiring

27

1      MR. WILLIAMS: No, Your Honor. Again, they
2  identified six models out of 16-17. They could certainly
3  get the other models. Through the tear-down, they could
4  purchase them as easily as Dell could absorb the expense and
5  tell us the modules in fact they're accusing of infringement
6  rather than asking us to go back and conduct a unilateral
7  analysis of our products and say, well, maybe this module
8  infringes or maybe this one doesn't. And I think the burden
9  should be on them in the first instance to say a particular
10  LCD module in a particular computer model we contend meets
11  the elements of the claims in our patent instead of
12  vice-versa.
13      THE COURT: All right. And I am going to have
14  to get into a criminal proceeding here in a few minutes, so
15  I won't have an opportunity to resolve other issues that you
16  may have besides this one.
17      My understanding of what is being asked for has
18  shifted a little bit in the course of this conversation.
19  So instead of trying to speak in terms of what it is you
20  are asking for, let me tell you what I think you can
21  legitimately ask for and we can get this thing moving
22  forward.
23      I said in the order that I put out last May that
24  Honeywell was required to specifically identify accused
25  products. And that's what I meant. Not that Honeywell was

29

1  additional discovery from them. But to ask them to come
2  forward in the first instance, which is what it really comes
3  down to, is not right.
4      So I hope this straightens out where my thinking
5  is on it and gives you guidance about what I'm expecting the
6  parties to be willing to do. To the extent manufacturers
7  are prepared to say, you know what? For us, it's not such a
8  burden as to make it impossible to give you something more
9  broad than what the judge has ordered happen, that is fine
10  with me. But what I do expect to happen at this juncture is
11  for you guys to come together with a specific set now of
12  identified products and manufacturers of the models of LCD
13  modules that go into those products so that we can go about
14  having the proper defendants in the suit.
15      To the extent there was any thought that I was
16  putting the burden exclusively on the defendant retailers or
17  intermediate sellers, to third-party people in, that is not
18  necessarily the case. I'm not going to get to that issue
19  today, though, because we don't have time to fully explore
20  it, but I expect Honeywell to be active in finding out who
21  those manufacturers are and that is one of the reasons why
22  I gave only a conditional stay, because one of the pieces
23  of information Honeywell is entitled to get as to those
24  identified products and product lines is who is the maker of
25  the LCD that is going in to that product, that generation of

30

1 product and maybe, I don't know, the generations before and
2 after that model.
3 So you guys absolutely on the defense side have
4 to give that information up. And then if we can't have some
5 sensible plan that the parties agree to on how to try to
6 bring those folks in, I'll get into the mix on that, too. I
7 would think that overseas marketers of LCD modules who have
8 big clients in the United States incorporating those things
9 into their products are not going to want to upset their
10 clientele by playing games with jurisdiction. And
11 particularly in the aftermath of the Federal Circuit's
12 CEA decision, which I remember well, I would think people
13 would be thinking hard about how they're going to play
14 the personal jurisdiction defenses here. But that is a
15 discussion for another day.
16 For now, I want you to get off of the
17 who-goes-first issue because Honeywell you guys are going
18 first. You identify what is infringing. Let's get those
19 manufacturers on notice and let's get the case going
20 forward.
21 When can I expect to hear back from you about a
22 plan for getting that done, Mr. Lueck?
23 MR. LUECK: Within a week, Your Honor. If I
24 could ask for just one clarification, recognizing you have
25 something else going.

31

1 The issue that we've had is just identifying who
2 the manufacturers of the modules are that are coming into
3 the U.S. And hearing what Your Honor has said regarding
4 those modules, can we ask about historical products that
5 have those modules or similar modules in them?
6 THE COURT: Well, when you say the "same" or
7 "similar," you know, the "same," absolutely. When you say
8 "similar," that is a big door, because, what do you mean
9 when you say "similar?"
10 MR. LUECK: Right. Here is what I mean when I
11 say "similar," Your Honor. A light source, an LCD panel,
12 two lens arrays, one of which is misaligned.
13 THE COURT: If you want to say, if you want to
14 frame your discovery in a manner that incorporates your
15 specific allegations of infringement, fine.
16 MR. LUECK: That is exactly what we're asking
17 for. And that we would frame it exactly that way.
18 THE COURT: All right. Does everybody
19 understand the discovery I'm telling them they're entitled
20 to?
21 (Pause.)
22 THE COURT: I'm not hearing anybody say no.
23 MR. HORWITZ: Your Honor?
24 THE COURT: Yes, go ahead.
25 MR. HORWITZ: This is Rich Horwitz. And I'll

32

1 defer to others if I'm missing something here, but I think
2 the problem with what Mr. Lueck just said is he may be
3 asking for things that led us to the stay motion in the
4 first instance.
5 THE COURT: No. What led to the stay motion in
6 the first place is I'm not going to have the folks who are
7 reselling things, reselling the LCD module as a part of
8 their own product defending in the first instance.
9 MR. HORWITZ: I'm sorry. I understand that,
10 Your Honor. What I meant was that some of the people that
11 are the resellers may not have the information that would
12 respond to the broad question that Mr. Lueck just posed.
13 THE COURT: Well, and if you don't have it, you
14 don't have it.
15 MR. HORWITZ: Okay.
16 THE COURT: I mean I'm not saying anybody has to
17 make anything up, but if you've got the information, you
18 need to give it up because they're entitled to get behind
19 your products and get it to people who are making them if
20 they can get jurisdiction over them. And that's all.
21 Like I said, the personal jurisdiction issue,
22 that's for another day. But finding out who the
23 manufacturers are, that's something that is supposed to have
24 been happening over the course the last four months and it's
25 distressing to hear that we've been not moving forward on

33

1 that front because we should be. We should be finding out
2 who this case is going to run against in the first instance.
3 So I'll ask the parties to move forward with that forthwith;
4 all right?
5 And, Mr. Lueck, I'll look forward to hearing
6 from you some time in the next few days in a fashion that
7 includes discussions to the extent you need to have it with
8 all defense counsel on how you folks intend to proceed so
9 that I can get a scheduling order in place.
10 I'm going to set a deadline on you folks
11 reporting back to me for two weeks from today; all right?
12 And hopefully that can be a joint submission. But if it
13 can't given, the number of parties involved, it may be
14 impracticable, I'll expect though to hear from everybody
15 with a position on scheduling because what you can expect
16 from me is I'm ready to put an order in place. I want to
17 get a schedule in place. So you should be talking about how
18 to make that happen.
19 All right. Is there any other matter which is
20 of such urgency we ought to address it right now while we're
21 all on the phone right now, Mr. Lueck?
22 MR. LUECK: No, Your Honor.
23 THE COURT: From the defense side, anything?
24 MR. HORWITZ: No, Your Honor.
25 THE COURT: Okay. I'm hearing --

Friday, September 9, 2005

34

1      MR. GRIMM: Your Honor?
2      THE COURT: Yes.
3      MR. GRIMM: Your Honor, this is Tom Grimm.
4      I do have a concern of letting this go on and on
5  because we've had such a hard time in the last three or four
6  months. And this has been very helpful to us but I'm
7  wondering if we could bother the Court for your permission
8  that in two weeks after we report, if there is still
9  differences, can we contact your clerk and ask for another
10 telephone conference?
11     THE COURT: Well, that is something you are
12 always free to do. If there is a problem in the case that I
13 can help you work out, I'm ready to help you work it out.
14 But I'm fully expecting on the basis of the discussion we
15 just had, for you to be able to take the next step, which is
16 set a schedule for getting this case transitioned to an
17 infringement suit against the manufacturers. All right?
18     MR. GRIMM: All right.
19     MR. GRAHAM: Your Honor, this is Barry Graham
20 for Nikon.
21     Nikon would like to be able to step aside. Do
22 we need to participate since we already provided the
23 information to Honeywell?
24     THE COURT: The short answer is if Honeywell
25 and you agree that you don't have anything else to say with

35

1  respect to the case, I'm not going to default you. And at a
2  certain point in time, there will be a transition from a
3  conditional stay to a full stay but I don't want to handle
4  that on a defendant-by-defendant basis if I can help it, so
5  I'm not moving on that request that you made earlier in this
6  call at this time.
7      MR. GRAHAM: All right. Thank you, Your Honor.
8  I'll speak with plaintiffs' counsel.
9      THE COURT: All right. Well, thanks for your
10 time this morning. Good-bye.
11     (The attorneys respond, "Thank you, Your
12 Honor.")
13     (Telephone conference ends at 11:18 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT G**



**DLA Piper LLP (US)**
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Erin P. Gibson
erin.gibson@dlapiper.com
**T**  619.699.2862
**F**  619.318.7147

February 16, 2011

574500-000003

*VIA E-MAIL*
*JCASTELLANO@YCST.COM*

Jeff Castellano
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19801

Re:    ***Ricoh Company Ltd., et al v. Oki Data Corporation, et al.,*** **District of Delaware Case No.
         09-cv-694-SLR**

Dear Jeff:

We are writing to address various deficiencies in Oki's document production and in its responses to
Ricoh's discovery requests.

**Oki's Document Production**

We have identified the following deficiencies in Oki's document production.  Specifically, we have been
unable to locate any responsive documents relating to the following Ricoh requests, which were served
on July 20 and October 8, 2010:

**Document Request No. 2(3):**  Documents sufficient to show the design and operation of Oki's accused
products having an image carrier with a static friction coefficient with respect to paper of from about 0.1 to
about 0.4, including data relating to static friction coefficient and roughness tests and specifications for
paper recommended for use in Oki's accused products.

**Document Request Nos. 10-14:**  Documents sufficient to show any mechanism in the Oki accused
products to control the configuration of the printer device and to update the control memory.

**Document Request Nos. 15-18:**  Documents sufficient to show any power saving function in the Oki
accused products, including control specifications for automatic receive mode, test results of power
consumption, specifications showing the on/off state of each electrical part during automatic receive
mode and schematics or block diagrams of Oki products that show power supply lines for each electrical
part.

**Document Request Nos. 32-33:**  Documents related to any analysis of Ricoh's products done by or for
Oki, including purchasing history of Ricoh's products.

**Document Request Nos. 35, 92:**  Laboratory notebooks or reports prepared by or for the inventors of the
asserted Oki patents that relate to any aspect of their claimed inventions.



Jeff Castellano
February 16, 2011
Page Two

**Document Request No. 36:**  Results of prior art searches conducted by or for Oki relating to the Oki asserted patents, including results of prior art searches conducted before the filing of the applications from which those patents issued.

**Document Request No. 37:**  Documents relating to any disclosures to third parties of any invention claimed in the Oki asserted patents or any product embodying any such invention.

**Document Request Nos. 38, 56, 57:**  Documents prior to July 13, 2003 relating to any Oki fuser unit having guiding members that guide paper through the unit and spacers that contact a fixing roller to keep the guiding member at a distance from the roller, including laboratory notebooks of Naoki Sunaga, Tsutomu Yamoto, Tatsuya Murakami and Masato Sakai (inventors on Oki patent application publication U.S. 2003/0081970) that contain this type of information.

**Document Request Nos. 40, 58, 62:**  Documents dated before July 31, 2006 or August 2, 2005 relating to Oki developer carriers and the amount of developer carried by each developer carrier, such as schematic drawings of screws in developer units and data relating to rotation speed of screws in the developer units.

**Document Request No. 67:**  Documents sufficient to identify Oki products that purportedly incorporate the inventions claimed in the Oki asserted patents.

**Document Request No. 92:** Laboratory notebooks of Mr. Koyama at the time of conception of the '105 patent.

Please immediately produce these documents.  If you believe you have produced all relevant documents for any or all of the categories listed above, please tell us where in Oki's production the responsive documents are located.

**Oki's Japanese Language Documents**

It is not possible to run Japanese search terms in Oki's production, because the Japanese text is not sufficiently clear to be recognized by any search engine.  Please produce the Japanese versions of Oki's documents in native file format so we can run searches through the production.  Please also confirm that Oki will produce emails from the selected email custodians in native file format.

**Oki's Interrogatory Responses**

Oki has not served any supplemental responses to Ricoh's First Set of Interrogatories.  Please supplement your responses to address the deficiencies in at least the following interrogatories:

**Interrogatory No. 1:**  Oki has identified only two products in response to Ricoh's interrogatory seeking identification of each Oki accused product.  It is clear to us that there are other products that should be listed, so we ask that you supplement this response with a complete list of accused products.

**Interrogatory Nos. 7, 8, 9, 10, 11, 15:**  In response to these interrogatories, Oki Data responded that it would identify documents that purportedly support its contentions.  Please do so, and confirm that all documents responsive to these interrogatories have been produced.



Jeff Castellano
February 16, 2011
Page Three


We look forward to your prompt response.

Best regards,
**DLA Piper LLP (US)**

***/s/ Erin P. Gibson***

Erin P. Gibson
Associate

Admitted to practice in California

cc:      All Counsel of Record

WEST\223092529.1

**<u>EXHIBIT H</u>**

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J. A. POPPER
NEILLI MULLEN WALSH
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER

PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
EDMON L. MORTON
JOHN E. TRACEY
ADAM W. POFF
SEAN M. BEACH
JOSEPH M. BARRY
SHARON M. ZIEG
DAVID R. HURST
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
DANIEL F.X. GEOGHAN
(NY, NJ, MI ONLY)

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE  19801

P.O. BOX 391
WILMINGTON, DELAWARE  19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE  19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338
WWW.YOUNGCONAWAY.COM

DIRECT DIAL: (302) 571-6654
DIRECT FAX: (302) 576-3467
kkeller@ycst.com

IAN J. BAMBRICK
RYAN M. BARTLEY
DONALD J. BOWMAN, JR.
ELISABETH S. BRADLEY
MICHELE SHERRETTA BUDICAK
EMILY V. BURTON
ERIKA R. CAESAR
JEFFREY T. CASTELLANO
DOUGLAS T. COATS
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
JUSTIN P. DUDA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
MARIS FINNEGAN
DAVID M. FRY
WILLIAM E. GAMGORT
MARGARET WHITEMAN GREECHER
SEAN T. GREECHER
A. DAVID HANSEN
STEPHANIE L. HANSEN
JAMES L. HIGGINS
PATRICK A. JACKSON

KAREN E. KELLER
JENNIFER M. KINKUS
SARA BETH A. R. KOHUT
EVANGELOS KOSTOULAS
PILAR G. KRAMAN
JOIN C. KUFFEL
PAUL J. LOUGHMAN
ANDREW A. LUNDGREN
JAIME N. LUTON
ANDREW L. MAGAZINER
KATHALEEN MCCORMICK
TAMMY L. MERCER
LAUREN E. MOAK
MICHAEL S. NEIBURG
JENNIFER R. NOEL
ROBERT F. POPPITI, JR.
NICHOLAS J. ROHRER
JUSTIN H. RUCKI
ANDREW E. RUSSELL
CHERYL A. SANTANIELLO
MORGAN L. SEWARD
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
RICHARD J. THOMAS
JAMES M. YOCH, JR.

COUNSEL
CURTIS J. CROWTHER
ADRIA B. MARTINELLI
KAREN L. PASCALE

OF COUNSEL
BRUCE M. STARGATT

February 24, 2011

**BY E-MAIL**

Erin Gibson, Esquire
DLA Piper LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297

      Re:    *Ricoh Co., Ltd. v. Oki Data Corp.*, C.A. No. 09-694-SLR

Dear Erin:

      This letter responds to your letter dated February 16, 2011 regarding Oki's document production and interrogatory responses.

      First, there are numerous errors and faulty assumptions in your letter related to the purported "deficiencies" in Oki's document production.

      For example, your description of Ricoh's document requests is inaccurate, and does not match up with the substance of the actual document requests. Thus, we do not agree that any of your descriptions are accurate representations of either the letter or the spirit of Ricoh's requests. A few limited examples:

- Document request numbers 2 and 3 do not refer to "data relating to static friction coefficient and roughness tests" or "specifications for paper recommended for use in Oki's accused products."

- Document request numbers 10-14 are much narrower than your description. For example, Request No. 12 seeks "[d]ocuments sufficient to show any mechanism for updating a control memory in the Oki Data Accused Products *based on a series of printer control parameters received from a remote computer, where the printer control parameters are*

                                        

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Erin Gibson, Esquire
February 24, 2011
Page 2

*stored based on an identification of the remote computer, including by an Internet address of the remote computer.*" (emphasis added)  It does not request "[d]ocuments sufficient to show any mechanism in the Oki accused products . . . to update the control memory," as you claim.

- Document request numbers 15-18 are much narrower than your description.  For example, Request No. 17 seeks "[d]ocuments sufficient to show any power saving function in the Oki Data Accused Products *that switches from a power saving state to another state upon receiving a predetermined signal, where the other state includes a normal state in which power is supplied to all portions of the facsimile machine, and readerless state in which power is supplied to all portions of the facsimile machine expect for the reading device.*" (emphasis added)  It does not request "[d]ocuments sufficient to show any power saving function in the Oki accused products," as you claim.  Furthermore, these requests nowhere refer to "control specifications for automatic receive mode, test results of power consumption, specifications showing the on/off state of each electrical part during automatic receive mode and schematics or block diagrams of Oki products that show power supply lines for each electrical part."

- Document request numbers 32 and 33 are focused on infringement analyses only, and are thus much narrower than your description.  These requests also do not refer to a "purchasing history" of Ricoh's products by Oki.

- Document request numbers 38, 56 and 57 do not refer to laboratory notebooks at all, and none of the individuals mentioned, nor the application number cited, are referenced in these requests.

- Document request numbers 40, 58, and 62 do not mention "schematic drawings" at all, and do not refer to "data relating to rotation speed of screws in the developer units."

- Document request 67 does not ask for documents "sufficient to identify Oki products that purportedly incorporate the inventions claimed in the Oki asserted patents."  Rather, it requests "documents upon which Oki Data intends to rely to prove its contention that Oki Data products practice the Oki Data Asserted Patents."

Because your descriptions are inaccurate, Oki Data cannot seriously entertain your request to produce or identify documents in response.  The Federal Rules require that any document request "must describe with reasonable particularity each item or category" requested.  Fed. R. Civ. P. 26(b)(1)(A).  Oki Data responded to the requests it understood Ricoh to be making.  Ricoh's failure to describe its request without particularity cannot be blamed on Oki Data.

Second, your letter completely ignores Oki Data's responses to Ricoh's document requests.  In response to each document request, Oki Data, based on its understanding of each individual request, either agreed to produce certain specific documents or types of documents, or refused to do so.  Oki Data made clear in its responses which documents or categories of

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Erin Gibson, Esquire
February 24, 2011
Page 3

documents it intended to produce. Until your February 16 letter, Ricoh never took issue with any of Oki Data's responses. In reliance on Ricoh's failure to object, Oki Data undertook its search for and production of the documents it had agreed to produce. It is now well past the close of document discovery and close to the time for depositions, and Ricoh's opportunity to broadly challenge Oki Data's positions on document production has long past. Oki Data does not intend to search for and produce documents a second time because of Ricoh's delinquency.

If, however, Ricoh believes that Oki Data has not produced the documents *it agreed to produce in response to one or more of Ricoh's requests*, please explain with particularity, how the documents Ricoh is now seeking fall within Oki's commitment to produce. With that foundation, Oki Data may be willing to discuss the issue further with Ricoh.

Third, in response to some of the identified document requests, Oki expressed a willingness to meet and confer about the scope of the request. Ricoh never requested a meet and confer about the scope of these requests. Again, Oki Data relied on Ricoh's silence when it searched for and produced documents, and is unable to negotiate as to the scope of Ricoh's document requests at this late stage.

To the extent you have identified specific documents that Ricoh believes fall within the scope of Oki Data's commitments to produce, but which were not produced, Oki Data will endeavor to search for and produce those documents. Please identify such materials with particularity so that we can address Ricoh's concerns.

Fourth, Ricoh requests that Oki Data produce certain Oki Data documents in native file format so that Ricoh may run search engines through the production. Neither party produced documents in the ITC proceedings in native file format and Ricoh did not complain at that time. In light of this history and now that document discovery has been complete for months, it is highly prejudicial and burdensome to make such a demand. Further, neither the Federal Rules, nor the D. Del. Default Standard for Electronic Discovery requires production in native format. Oki Data will not produce documents in this format.

Finally, Ricoh takes issue with Oki Data's responses to certain interrogatory requests. Ricoh asserts that Oki Data must supplement its response to Interrogatory No. 1 to provide a complete list of accused products. It is not Oki Data's responsibility to identify products for Ricoh to accuse. That is a task that Ricoh must complete. *Honeywell Int'l Inc. v. Audiovox Communications Corp.*, C.A. Nos. 04-1337-KAJ, 04-1338-KAJ, Transcript at 18: 16-19 (D. Del. July 21, 2006) ("I don't think you can go to somebody and say I'm suing you and now tell me why I'm suing you."). Further, Ricoh should have completed a Rule 11 analysis prior to bringing its allegations of infringement against Oki Data. Discovery is not a fishing expedition to force Oki Data to do Ricoh's dirty work. *Honeywell Int'l Inc. v. Audiovox Communications Corp.*, C.A. Nos. 04-1337-KAJ, 04-1338-KAJ, Transcript at 28:12-20 (D. Del. Sept. 9, 2005) ("But what you are not entitled to do is to say you manufacture 15 different kinds of cell phones. We tore down three. Tell us about your other 12. Because I agree with the defendants that now what you are doing is you are telling manufacturers, you know what? You got one or two things that are bad. We want you to do an analysis of everything you make and tell us whether you are

Y<small>OUNG</small> C<small>ONAWAY</small> S<small>TARGATT</small> & T<small>AYLOR</small>, LLP

Erin Gibson, Esquire
February 24, 2011
Page 4

guilty on those fronts, too; and that is not what the law requires, and it's not what I'm going to require them to do."). It has never been Oki Data's burden to identify accused products and Oki Data will not undertake to do any such thing.

As to Interrogatory Nos. 7, 8, 9, 10, and 11, these interrogatories are complete with regard to information presently in Oki Data's possession, custody or control. As to Interrogatory No. 15, we will supplement that interrogatory to identify the specific documents within the next week.

Best regards,

Karen E. Keller

cc:     Marc R. Labgold, Ph.D., Esquire (by e-mail)

**<u>EXHIBIT I</u>**

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
NEILLI MULLEN WALSH
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER

PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
EDMON L. MORTON
JOHN E. TRACEY
ADAM W. POFF
SEAN M. BEACH
JOSEPH M. BARRY
SHARON M. ZIEG
DAVID R. HURST
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
DANIEL F.X. GEOGHAN
(NY, NJ, MI ONLY)

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

(302) 571-6600
FAX: (302) 571-1253

WWW.YOUNGCONAWAY.COM

DIRECT DIAL: (302) 571-6689
DIRECT FAX: (302) 576-3334
jshaw@ycst.com

IAN J. BAMBRICK
RYAN M. BARTLEY
DONALD J. BOWMAN, JR.
ELISABETH S. BRADLEY
MICHELE SHERRETTA BUDICAK
EMILY V. BURTON
ERIKA R. CAESAR
JEFFREY T. CASTELLANO
DOUGLAS T. COATS
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
JUSTIN P. DUDA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
MARIS FINNEGAN
DAVID M. FRY
WILLIAM E. GAMGORT
MARGARET WHITEMAN GREECHER
SEAN T. GREECHER
A. DAVID HANSEN
STEPHANIE L. HANSEN
JAMES L. HIGGINS
PATRICK A. JACKSON

KAREN E. KELLER
JENNIFER M. KINKUS
SARA BETH A. R. KOHUT
EVANGELOS KOSTOULAS
PILAR G. KRAMAN
JOHN C. KUFFEL
PAUL J. LOUGHMAN
ANDREW A. LUNDGREN
JAIME N. LUTON
ANDREW L. MAGAZINER
KATHALEEN MCCORMICK
TAMMY L. MERCER
LAUREN E. MOAK
MICHAEL S. NEIBURG
JENNIFER R. NOEL
ROBERT F. POPPITI, JR.
NICHOLAS J. ROBHER
JUSTIN H. RUCKI
ANDREW E. RUSSELL
CHERYL A. SANTANIELLO
MORGAN L. SEWARD
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
RICHARD J. THOMAS
JAMES M. YOCH, JR.

COUNSEL
CURTIS J. CROWTHER
ADRIA B. MARTINELLI
KAREN L. PASCALE

OF COUNSEL
BRUCE M. STARGATT

March 10, 2011

**BY E-MAIL**

Erin Gibson, Esquire
DLA Piper LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297

Re:    *Ricoh Co., Ltd. v. Oki Data Corp.*, C.A. No. 09-694-SLR

Dear Erin:

We were shocked and surprised to receive today the documents Ricoh labeled "supplemental" interrogatory responses.

Far from being "supplemental" responses, what we received were brand-new contentions that should have been served long ago – certainly no later than last December under the Scheduling Order – and lists of newly "accused products" without claim charts. No events have happened to justify such completely new responses at this late stage of the case. For example, these responses purport to accuse dozens of new products of infringement and provide claim charts for these products for the first time. For other newly "accused" products, there are no claim charts at all. There is no basis to have waited until just three weeks before the close of fact discovery to make these assertions for the first time.

This conduct is sand-bagging, pure and simple. In responding to interrogatories, a party must provide all information currently in its possession, custody or control, and can supplement only with newly discovered information as set forth in Rule 26(e). *Amberwave Sys. Corp. v. Intel Corp.*, C.A. No. 05-301-KAJ, Tr. at 20:19-21 (D. Del. May 3, 2006) (regarding duty to respond to contention interrogatories, "if you have a basis that you can put forward now, you should put it forward now. If you know, you should say."). If you had this information before, it is too late to provide it now for the first time. If you contend you did not have this information before, what information in these responses was uncovered after the December deadline that was not previously available? Further, with three weeks left in discovery, what is the basis to merely list a series of products and to provide no claim charts at all? Ricoh's attempt to add information

YCST01:10783633.1                                                                                    069002.1002

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Erin Gibson, Esquire
March 10, 2011
Page 2

is highly prejudicial, and we intend to ask Judge Thynge to strike this "supplemental" information.

      We therefore request a meet and confer as early as tomorrow, Friday, March 11, 2011.  In that regard, we have asked repeatedly for meet and confer sessions over the past five weeks, and the only time Ricoh did not ignore our requests was when Ricoh wanted to use the meet and confer as a tool to bring its own a discovery dispute to Judge Thynge the next day.  Ricoh cannot insulate itself from its poor discovery conduct by refusing to meet and confer.  This conduct is unreasonable, and it puts the entire case schedule into jeopardy.

      I look forward to hearing your availability.

Cordially yours,

*/s/  John W. Shaw*

John W. Shaw

cc:    Marc R. Labgold, Ph.D., Esquire (by e-mail)
       David Moore, Esquire (by e-mail)